**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ALPHA MODUS, CORP.<br><br>v.<br><br>THE KROGER CO. | Case No. 2:25-CV-00923-JRG-RSP<br><br><br>JURY TRIAL DEMANDED |

## ANSWER AND COUNTERCLAIMS

Defendant The Kroger Co. ("Kroger") by and through its attorneys hereby submits its Answer and responds to Plaintiff Alpha Modus, Corp.'s ("Alpha Modus") First Amended Complaint (Dkt. 21) alleging infringement of United States Patent Nos. 10,360,571 (the "'571 Patent"), 10,853,825 (the "'825 Patent"), 10,977,672 (the "'672 Patent"), 11,042,890 (the "'890 Patent"), 11,301,880 (the "'880 Patent"), 11,049,120 (the "'120 Patent"), 12,026,731 (the "'731 Patent"), 12,354,121 (the "'121 Patent"), and 12,423,718 (the "'718 Patent") (collectively the "Asserted Patents"). Kroger's answer, defenses, and counterclaims are as follows.

Except as expressly admitted, Kroger denies each and every allegation of the First Amended Complaint. Kroger's specific responses to the numbered allegations are set forth below and correspond to the numbered allegations in the First Amended Complaint.

The first two paragraphs of the First Amended Complaint do not appear to contain any allegations requiring a response. To the extent these first two paragraphs contain allegations directed to Kroger, Kroger admits that the First Amended Complaint purports to be a complaint for patent infringement but denies that Kroger has infringed any valid and enforceable patent claim or that Alpha Modus is entitled to any relief.

For ease of reference, Kroger has included the headings from the First Amended Complaint in the following. The inclusion of these headings is not an admission by Kroger and to the extent that any heading or other non-numbered statement in the First Amended Complaint contains or implies any allegations, Kroger denies each and every allegation therein.

## THE PARTIES

1. Kroger lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

2. Admitted.

## JURISDICTION AND VENUE

3. Kroger admits the First Amended Complaint purports to allege patent infringement. Otherwise denied.

4. Kroger admits the Court has jurisdiction over patent issues. Otherwise denied.

5. Admitted.

6. Admitted.

7. Kroger admits that it has conducted business in this District. Otherwise denied.

8. Kroger admits that this Court has personal jurisdiction over Kroger. Otherwise denied.

9. Denied.

10. Denied.

11. Denied.

12. Kroger is registered to do business in Texas and has transacted business in this District. Otherwise denied.

13. Admitted.

14. Denied.

15. Admitted.

## ALPHA MODUS'S ALLEGED INNOVATION IN RETAIL TECHNOLOGY

16. Denied.

17. Denied.

18. Denied.

19. Kroger lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

## THE '571 PATENT

20. Kroger admits that a copy of the '571 Patent was included as an exhibit to the First Amended Complaint but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

21. Admitted.

22. Kroger admits the priority claim is stated but denies that Plaintiff has established the '571 Patent is entitled to that priority.

23. Kroger admits the '571 Patent issued on July 23, 2019 but denies the examination was "full and fair" because material prior art information was withheld from the U.S. Patent and Trademark Office ("USPTO").

24. Denied.

25. Kroger admits that the '571 Patent generally refers to some of the concepts mentioned in this paragraph of the First Amended Complaint but denies the allegations to the extent they characterize the patent's disclosures, teachings, scope, claim scope, or legal effect. Kroger denies all remaining allegations in this paragraph.

26. Denied.

27. Denied.

28. Kroger admits that the ‘571 Patent generally refers to some of the concepts mentioned in this paragraph of the First Amended Complaint but denies the allegations to the extent they characterize the patent’s disclosures, teachings, scope, claim scope, or legal effect. Kroger denies all remaining allegations in this paragraph.

29. Kroger admits the allegations in this paragraph only to the extent they accurately reproduce the text of claim 1 of the ’571 Patent. Kroger denies any inaccurate quotation and any characterization of the claim’s meaning, scope, or legal effect.

## THE ‘825 PATENT

30. Kroger admits that a copy of the ‘825 Patent was included as an exhibit to the First Amended Complaint but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

31. Admitted.

32. Kroger admits the priority claim is stated but denies that Plaintiff has established the ‘825 Patent is entitled to that priority.

33. Kroger admits the ‘825 Patent issued on December 1, 2020 but denies the examination was “full and fair” because material prior art information was withheld from the USPTO.

34. Denied.

35. Denied.

36. Denied.

37. Denied.

38. Denied.

39. This paragraph of the First Amended Complaint states legal conclusions, which Kroger denies.

40. Kroger admits the allegations in this paragraph only to the extent they accurately reproduce the text of claim 1 of the ’825 Patent. Kroger denies any inaccurate quotation and any characterization of the claim’s meaning, scope, or legal effect.

**THE ‘672 PATENT**

41. Kroger admits that a copy of the ‘672 Patent was included as an exhibit to the First Amended Complaint but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

42. Admitted.

43. Kroger admits the priority claim is stated but denies that Plaintiff has established the ‘672 Patent is entitled to that priority.

44. Kroger admits the ‘672 Patent issued on April 13, 2021 but denies the examination was “full and fair” because highly material prior art information was withheld from the USPTO.

45. Denied.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. This paragraph of the First Amended Complaint states legal conclusions, which Kroger denies.

51. Kroger admits the allegations in this paragraph only to the extent they accurately reproduce the text of claim 1 of the ’672 Patent. Kroger denies any inaccurate quotation and any characterization of the claim’s meaning, scope, or legal effect.

**THE ‘890 PATENT**

52. Kroger admits that a copy of the ‘890 Patent was included as an exhibit to the First Amended Complaint but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

53. Admitted.

54. Kroger admits the priority claim is stated but denies that Plaintiff has established the ‘890 Patent is entitled to that priority.

55. Kroger admits the ‘890 Patent issued on June 22, 2021 but denies the examination was “full and fair” because highly material prior art information was withheld from the USPTO.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. This paragraph of the First Amended Complaint states legal conclusions, which Kroger denies.

61. Kroger admits the allegations in this paragraph only to the extent they accurately reproduce the text of claim 1 of the ’890 Patent. Kroger denies any inaccurate quotation and any characterization of the claim’s meaning, scope, or legal effect.

**THE ‘880 PATENT**

62. Kroger admits that a copy of the ‘880 Patent was included as an exhibit to the First Amended Complaint but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

63. Admitted.

64. Kroger admits the priority claim is stated but denies that Plaintiff has established the ‘880 Patent is entitled to that priority.

65. Kroger admits the ‘880 Patent issued on April 12, 2022 but denies the examination was “full and fair” because highly material prior art information was withheld from the USPTO.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

71. This paragraph of the First Amended Complaint states legal conclusions, which Kroger denies.

72. Kroger admits the allegations in this paragraph only to the extent they accurately reproduce the text of claim 1 of the ’880 Patent. Kroger denies any inaccurate quotation and any characterization of the claim’s meaning, scope, or legal effect.

**THE ‘120 PATENT**

73. Kroger admits that a copy of the ‘120 Patent was included as an exhibit to the First Amended Complaint but lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

74. Kroger admits that the priority claim is stated but denies that Plaintiff has established the ‘120 Patent is entitled to that priority.

75. Kroger admits the ‘120 Patent issued on June 29, 2021 but denies the examination was “full and fair” because material prior art information was withheld from the USPTO.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. This paragraph of the First Amended Complaint states legal conclusions, which Kroger denies.

82. Kroger admits the allegations in this paragraph only to the extent they accurately reproduce the text of claim 1 of the ’120 Patent. Kroger denies any inaccurate quotation and any characterization of the claim’s meaning, scope, or legal effect.

## THE ‘731 PATENT

83. Kroger admits that a copy of the ‘731 Patent was included as an exhibit to the First Amended Complaint but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

84. Kroger admits that the ’731 Patent issued from U.S. Patent Application No. 18/100,377 filed on January 23, 2023.

85. Kroger admits that the ‘731 Patent is a continuation of application No. 17/590,605, which was filed on February 1, 2022, assuming that was the date intended by the Plaintiff's “20022” year. Otherwise denied.

86. Kroger admits the ‘731 Patent issued on July 2, 2024 but denies the examination was “full and fair” because highly material prior art information was withheld from the USPTO.

87. Denied.

88. Denied.

89. Denied.

90. Denied.

91. Denied.

92. This paragraph of the First Amended Complaint states legal conclusions, which Kroger denies.

93. Kroger admits the allegations in this paragraph only to the extent they accurately reproduce the text of claim 1 of the ’731 Patent. Kroger denies any inaccurate quotation and any characterization of the claim's meaning, scope, or legal effect.

**THE ‘121 PATENT**

94. Kroger admits that a copy of the ‘121 Patent was included as an exhibit to the First Amended Complaint but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

95. Kroger admits that the priority claim is stated but denies that Plaintiff has established the ‘121 Patent is entitled to that priority.

96. Kroger admits the ‘121 Patent issued on July 2, 2024 but denies the examination was “full and fair” because material prior art information was withheld from the USPTO.

97. Denied.

98. Denied.

99. Denied.

100. Denied.

101. Denied.

102. This paragraph of the First Amended Complaint states legal conclusions, which Kroger denies.

103. Kroger admits the allegations in this paragraph only to the extent they accurately reproduce the text of claim 1 of the ’121 Patent. Kroger denies any inaccurate quotation and any characterization of the claim’s meaning, scope, or legal effect.

**THE ‘718 PATENT**

104. Kroger admits that a copy of the ‘718 Patent was included as an exhibit to the First Amended Complaint but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph in the First Amended Complaint and therefore denies those allegations.

105. Kroger admits that the ’718 Patent issued from U.S. Patent Application No. 18/905,975, filed on February 1, 2022, and that the priority claim is stated but denies that Plaintiff has established the ‘718 Patent is entitled to that priority.

106. Denied.

107. Denied.

108. Admitted, but Kroger denies the allowance was proper.

109. Admitted.

110. This paragraph of the First Amended Complaint states legal conclusions, which Kroger denies.

111. Denied.

112. Denied.

113. Denied.

114. Denied.

115. Denied.

116. This paragraph of the First Amended Complaint states legal conclusions, which Kroger denies.

117. Kroger admits the allegations in this paragraph only to the extent they accurately reproduce the text of claim 1 of the ’718 Patent. Kroger denies any inaccurate quotation and any characterization of the claim’s meaning, scope, or legal effect.

**KROGER**

118. Kroger admits that Kroger and its various subsidiaries, which are not parties to this litigation, collectively own and operate a number of supermarkets and fuel centers in the United States under various brands or banners. Otherwise denied.

119. Kroger admits the suit mentioned in this paragraph was filed on January 24, 2024 and the three patents mentioned were asserted. Kroger also admits the Cooler Screens products were referenced in that Complaint.

120. To the extent the “Parties” in this paragraph includes Cooler Screens, admitted. Otherwise denied.

121. Kroger lacks knowledge or information sufficient to form a belief about the truth of the allegation, particularly what Plaintiff has “recently learned,” and therefore the allegation is denied.

122. Kroger is not in a position to admit or deny the allegation because it appears to be directed to another entity that is not a party to this case. It is also unclear whether “its subsidiary”

refers to Kroger or Barrows Connected Store, which further confuses the averment. Because the allegation is so vague and non-specific, Kroger lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore the allegations are denied.

123. Kroger admits that it has a loyalty program, but Kroger is not in a position to admit or deny the allegation because it appears to be directed to 84.51 LLC, an entity that is not a party to this case. Therefore, Kroger lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and therefore the allegations are denied.

124. Kroger admits that it uses Everseen anti-theft technologies, including in checkout lines. Kroger admits the quotations in this paragraph of the First Amended Complaint only to the extent they accurately reproduce the text appearing at the cited URLs. Kroger denies any inaccurate quotation and all remaining allegations in this paragraph.

125. Kroger admits that it has made a technology called Scan, Bag, Go available on personal devices and that a wireless handheld scanner was also available for customer to scan and bag products as they shop for a quicker, seamless checkout experience. Otherwise denied.

126. Kroger admits that a customer can use Kroger Pay to provide contact-free payments in-store and at fuel centers using mobile devices. Otherwise denied.

127. Kroger admits that Kroger KroGO carts use cameras and weight-sensing scales to detect items a person places inside a cart and that a screen typically displays a running total of those items and digital coupons. Otherwise denied.

128. Kroger admits that QueVision uses infrared sensors over store doors and cash registers to collect data on shopper traffic, predictive analytics, and data feeds from checkout lines. Otherwise denied.

129. Kroger admits that EDGE stands for Enhanced Display for Grocery Environment and that EDGE shelving proposed using displays to present prices, promotions, and nutritional and dietary information. Kroger further admits that a January 2019 press release described a collaboration with Microsoft Corp. and a potential pilot program involving the well-known prior-art concept of using video analytics to present personalized offers and advertisements based on customer demographics. Kroger denies that the press release states that EDGE shelving uses facial recognition or identifies "dynamic pricing" as a purpose of the shelving. Kroger denies the remaining allegations in this paragraph.

130. Kroger cannot admit or deny the allegation because it appears to be directed to another entity that is not a party to this case. Kroger admits the quotations in this paragraph of the Amended Complaint only to the extent they accurately reproduce the text appearing at the cited URL. Kroger denies any inaccurate quotation and all remaining allegations in this paragraph.

131. Denied.

132. Kroger admits the letter dated August 4, 2024 identified in this paragraph of the Amended Complaint was sent. The contents of the letter speak for themselves, and Kroger denies any characterization of the same. Kroger further denies implementing any technology that infringed Plaintiff's patents.

133. Denied.

134. Kroger admits it has been aware of three of the Asserted Patents since they were asserted in a complaint filed in January 2024.  Kroger denies any knowledge or awareness of any other fact, including but not limited to any other Asserted Patents and/or any knowledge or notice of alleged infringement.

135. Denied.

136. Denied.

137. Denied.

**COUNT I**
**(ALLEGED DIRECT INFRINGEMENT OF THE '571 PATENT)**

138. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

139. Denied.

140. Denied.

141. Denied.

142. Denied.

143. Denied.

144. Denied.

145. Denied.

146. Denied.

147. Denied.

148. Denied.

149. Denied.

150. Denied.

151. Denied.

152. Denied.

**COUNT II**
**(ALLEGED INDUCED INFRINGEMENT OF THE '571 PATENT)**

153. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

154. Denied.

155. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024, including the '571 Patent, based on the alleged implementation of Cooler Screens' technology. The remainder of the allegations are denied.

156. Denied.

157. Denied.

158. Denied.

159. Denied.

160. Denied.

161. Denied.

162. Denied.

**COUNT III**
**(ALLEGED DIRECT INFRINGEMENT OF THE '825 PATENT)**

163. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

164. Denied.

165. Denied.

166. Denied.

167. Denied.

168. Denied.

169. Denied.

170. Denied.

171. Denied.

172. Denied.

173. Denied.

174. Denied.

175. Denied.

176. Denied.

177. Denied.

**COUNT IV**
**(ALLEGED INDUCED INFRINGEMENT OF THE '825 PATENT)**

178. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

179. Denied.

180. Denied.

181. Denied.

182. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024 based on the alleged implementation of Cooler Screens' technology. The remainder of the allegations are denied.

183. Denied.

184. Denied.

185. Denied.

186. Denied.

**COUNT V**
**(ALLEGED DIRECT INFRINGEMENT OF THE ‘672 PATENT)**

187. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

188. Denied.

189. Denied.

190. Denied.

191. Denied.

192. Denied.

193. Denied.

194. Denied.

195. Denied.

196. Denied.

197. Denied.

198. Denied.

199. Denied.

200. Denied.

**COUNT VI**
**(ALLEGED INDUCED INFRINGEMENT OF THE ‘672 PATENT)**

201. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

202. Denied.

203. Denied.

204. Denied.

205. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024, including the ’672 Patent, due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

206. Denied.

207. Denied.

208. Denied.

209. Denied.

**COUNT VII**
**(ALLEGED DIRECT INFRINGEMENT OF THE ‘890 PATENT)**

210. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

211. Denied.

212. Denied.

213. Denied.

214. Denied.

215. Denied.

216. Denied.

217. Denied.

218. Denied.

219. Denied.

220. Denied.

221. Denied.

222. Denied.

223. Denied.

224. Denied.

**COUNT VIII**
**(ALLEGED INDUCED INFRINGEMENT OF THE '890 PATENT)**

225. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

226. Denied.

227. Denied.

228. Denied.

229. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024, including the '890 Patent, due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

230. Denied.

231. Denied.

232. Denied.

233. Denied.

**COUNT IX**
**(ALLEGED DIRECT INFRINGEMENT OF THE '880 PATENT)**

234. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

235. Denied.

236. Denied.

237. Denied.

238. Kroger grocery stores include many products, many of which are stocked on shelves. Otherwise denied.

239. Denied.

240. Denied.

241. Denied.

242. Denied.

243. Denied.

244. Denied.

245. Denied.

246. Denied.

247. Denied.

248. Denied.

249. Denied.

250. Denied.

**COUNT X**
**(ALLEGED INDUCED INFRINGEMENT OF THE '880 PATENT)**

251. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

252. Denied.

253. Denied.

254. Denied.

255. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024 due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

256. Denied.

257. Denied.

258. Denied.

259. Denied.

## COUNT XI
## (ALLEGED DIRECT INFRINGEMENT OF THE ‘120 PATENT)

260. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

261. Denied.

262. Denied.

263. Denied.

264. Denied.

265. Denied.

266. Denied.

267. Denied.

268. Denied.

269. Denied.

270. Denied.

271. Denied.

272. Denied.

273. Denied.

274. Denied.

## COUNT XII
## (ALLEGED INDUCED INFRINGEMENT OF THE ‘120 PATENT)

275. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

276. Denied.

277. Denied.

278. Denied.

279. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024, including the ’571 Patent, due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

280. Denied.

281. Denied.

282. Denied.

283. Denied.

## COUNT XIII
## (ALLEGED DIRECT INFRINGEMENT OF THE ‘731 PATENT)

284. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

285. Denied.

286. Denied.

287. Denied.

288. Denied.

289. Denied.

290. Denied.

291. Denied.

292. Denied.

293. Denied.

294. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024 due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

295. Denied.

296. Denied.

297. Denied.

298. Denied.

**COUNT XIV**
**(ALLEGED INDUCED INFRINGEMENT OF THE '731 PATENT)**

299. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

300. Denied.

301. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024 due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

302. Denied.

303. Denied.

304. Denied.

305. Denied.

306. Denied.

307. Denied.

## COUNT XV
## (ALLEGED DIRECT INFRINGEMENT OF THE '121 PATENT)

308. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

309. Denied.

310. Denied.

311. Denied.

312. Denied.

313. Denied.

314. Denied.

315. Denied.

316. Denied.

317. Denied.

318. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024 due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

319. Denied.

320. Denied.

321. Denied.

322. Denied.

**COUNT XVI**
**(ALLEGED INDUCED INFRINGEMENT OF THE '121 PATENT)**

323. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

324. Denied.

325. Denied.

326. Denied.

327. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024 due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

328. Denied.

329. Denied.

330. Denied.

331. Denied.

**COUNT XVII**
**(ALLEGED DIRECT INFRINGEMENT OF THE '718 PATENT)**

332. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

333. Denied.

334. Denied.

335. Denied.

336. Denied.

337. Denied.

338. Denied.

339. Denied.

340. Denied.

341. Denied.

342. Denied.

343. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024 due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

344. Denied.

345. Denied.

346. Denied.

347. Denied.

**COUNT XVIII**
**(ALLEGED INDUCED INFRINGEMENT OF THE '718 PATENT)**

348. Kroger repeats and incorporates by reference, as if fully set forth herein, its responses to the allegations of the preceding paragraphs.

349. Denied.

350. Denied.

351. Denied.

352. Kroger admits it was sued by Alpha Modus for infringing a subset of the Asserted Patents in January of 2024 due to its alleged implementation of Cooler Screens technology. The remainder of the allegation is denied.

353. Denied.

354. Denied.

355. Denied.

356. Denied.

357. Denied.

## JURY DEMAND

This paragraph sets forth Plaintiff's request for a jury trial to which no response is required.

## PRAYER FOR RELIEF

These paragraphs set forth the statement of relief requested by Alpha Modus, to which no response is required. To the extent a response is required, Kroger denies that Alpha Modus is entitled to any relief whatsoever, either legal or equitable.

## GENERAL DENIAL AND NON-WAIVER

Each and every allegation in the Amended Complaint not specifically admitted is denied, and the failure to deny a specific allegation, or assert a specific defense, shall not be deemed to be an admission of an allegation or a waiver of defense.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Kroger asserts the following separate and additional defenses, all of which are pled in the alternative, and none of which constitute an admission that Kroger is in any way liable to Alpha Modus, that Alpha Modus has been or will be injured or damaged in any way, or that Alpha Modus is entitled to any relief whatsoever. In addition to the affirmative defenses described below, subject to its responses above, Kroger specifically reserves all rights to allege additional affirmative defenses that become known through the course of discovery.

**FIRST AFFIRMATIVE DEFENSE**
**(Failure to State a Claim)**

Plaintiff's claims are barred wholly or in part because Plaintiff has failed to state any claim upon which relief can be granted with respect to Kroger with sufficient specificity and/or factual support to put Kroger on notice as to the claim being made and therefore fails to state a claim on which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**
**(Non-infringement)**

Kroger has not and does not directly or indirectly infringe any valid and enforceable claim of any Asserted Patent, either directly or indirectly, literally, or under the doctrine of equivalents. No claim of an Asserted Patent is directly infringed nor does Kroger have the specific intent required to prove indirect infringement.

**THIRD AFFIRMATIVE DEFENSE**
**(Invalidity)**

The claims of the Asserted Patents are invalid for failing to comply with the conditions of patentability set forth in the patent laws of the United States, 35 U.S.C. § 100, et seq., including without limitation, at least 35 U.S.C. §§ 101, 102, 103, and/or 112. More specifically, and without limitation, the claims of the Asserted Patents are invalid under 35 U.S.C. §§ 102 and/or 103 because they are anticipated or rendered obvious by relevant prior art, including, but not limited to, prior art of record during prosecution of the Asserted Patents and/or additional prior art that will be identified during discovery in this case. The claims of the Asserted Patents are also invalid under 35 U.S.C. § 112(a)/first paragraph because the specification does not contain a written description of the claimed invention sufficient enough to enable any person

skilled in the art to which it pertains. The claims of the Asserted Patents are also invalid under 35 U.S.C. § 112(b)/second paragraph because the claims do not particularly point out and distinctly claim the subject matter regarded as the invention.

Kroger served Invalidity Contentions on January 16, 2026 and relies on those and any supplementations or amendments thereto herein.

**FOURTH AFFIRMATIVE DEFENSE**
**(Inequitable Conduct)**

Plaintiff engaged in inequitable conduct during the prosecution of the Asserted Patents. The factual details of the inequitable conduct defense are pleaded with particularity in the Counterclaim for the same below, which is fully incorporated herein. The inequitable conduct alleged was pervasive and infects the entire patent family, and therefore all Asserted Patents should be found unenforceable.

**FIFTH AFFIRMATIVE DEFENSE**
**(Failure to Join A Necessary Party)**

Plaintiff's claims are directed at least in part to conduct allegedly performed by one or more third party companies, including separate corporate entities related to Kroger and separate vendor companies, that are not parties to this litigation yet are necessary in accordance with Rule 19.

**SIXTH AFFIRMATIVE DEFENSE**
**(No Entitlement to Pre-Suit Damages)**

Plaintiff's claims for damages are statutorily limited under 35 U.S.C. § 287 for any system or product claims for failure to properly mark any patented article made, sold, or offered

for sale in the United States by or with the authorization of Alpha Modus, including any of its licensees.

**SEVENTH AFFIRMATIVE DEFENSE**
**(Statute of Limitations)**

Plaintiff's claims for damages are limited by the statute of limitations in 35 U.S.C. § 286 for any alleged infringement that occurred more than 6 years before the first instance of an Asserted Patent being asserted in either the original Complaint or the First Amended Complaint.

**EIGHTH AFFIRMATIVE DEFENSE**
**(No Entitlement to Costs)**

If Kroger succeeds in invalidating a claim, which it will, Alpha Modus is barred from recovering costs under 35 U.S.C. § 288 because it failed to file "a disclaimer of the invalid claim [ ] at the Patent and Trademark Office before the commencement of the suit."

**NINTH AFFIRMATIVE DEFENSE**
**(No Provisional Rights)**

Plaintiff is not entitled to a reasonable royalty from Kroger under 35 U.S.C. § 154(d) during any period prior to the issuance of any Asserted Patent because Kroger has not made, used, offered for sale, or sold the inventions or processes as claimed in any published patent application for an Asserted Patent.

**TENTH AFFIRMATIVE DEFENSE**
**(No Injury/Standing)**

Plaintiff's infringement claims, damage claims, requests for relief, and/or standing to pursue such are limited or barred by Plaintiff's lack of legally cognizable injury.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(Prior Settlement)**

Plaintiff's claims, including those directed to Kroger's purported "ecosystem," are barred, in whole or in part, by the parties' prior settlement.

**TWELFTH AFFIRMATIVE DEFENSE**
**(No Right to Injunctive Relief)**

Plaintiff is not entitled to preliminary or permanent injunctive relief, inter alia, because any injury to Plaintiff is neither immediate nor irreparable, and Plaintiff has an adequate monetary remedy for any claim that it can prove, subject to any applicable defense and/or set-off.

**RESERVATION OF RIGHTS**

As Kroger's investigation is ongoing and discovery has not yet been completed, Kroger is without complete information regarding the existence or non-existence of other facts or acts that would constitute a defense to the purported causes of action in Plaintiff's First Amended

Complaint. Accordingly, Kroger reserves the right to assert any other defenses that discovery may reveal.

## COUNTERCLAIMS

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Kroger hereby asserts the following counterclaims against Alpha Modus, and in support alleges as follows:

## NATURE OF THE COUNTERCLAIMS

1. These Counterclaims seek a declaration, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Kroger does not infringe any valid and enforceable claim of any of the Asserted Patents and also seek a judgment that the Asserted Patents were procured by inequitable conduct, rendering all the Asserted Patents unenforceable. Kroger seeks damages pursuant to these counterclaims, including its attorneys' fees under 35 U.S.C. § 285, 28 U.S.C. §1927 and/or the court's inherent powers, as well as its taxable costs and other costs.

## THE PARTIES

2. Alpha Modus, Corp. is a corporation organized and existing under the laws of Florida with a principal place of business at 20311 Chartwell Center Dr., Suite 1469, Cornelius, North Carolina 28031.

3. The Kroger Co. is a corporation organized and existing under the laws of the State of Ohio with a principal place of business at 1014 Vine Street, Cincinnati, Ohio 45202-1100.

## JURISDICTION AND VENUE

4. These counterclaims arise under 28 U.S.C. §§ 2201 and 2202, as well as the Patent Act at 35 U.S.C. §§ 101 et seq.

5. There is a case or controversy regarding all Asserted Patents between Kroger and Alpha Modus by virtue of the original Complaint and the First Amended Complaint asserting infringement by Kroger. This Court has subject matter jurisdiction over these Counterclaims

pursuant to 28 U.S.C. §§ 1331 and 1338(a) and 28 U.S.C. §§ 2201 and 2202. The claims are federal in nature as the substantive issues fall under the Patent Act.

6. Venue and jurisdiction are proper because these counterclaims are brought against Alpha Modus, which is already the Plaintiff to this litigation. Specifically, personal jurisdiction over Alpha Modus is proper because, inter alia, Alpha Modus consented to the personal jurisdiction of this Court by commencing its action for patent infringement in this judicial district. Venue is likewise proper under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS COMMON TO ALL CAUSES

7. eyeQ, Inc. ("eyeQ") was created by Michael R. Garel ("Garel") in December of 2011 in Delaware.

8. Patent attorney Matthew J. Booth ("Booth") filed U.S. Provisional Patent Application 61/622,616 ("First Provisional Application") on behalf of eyeQ on April 11, 2012. The application lists Garel as the sole inventor and is titled "SYSTEM FOR MONITORING, ANALYZING, AND INFLUENCING CONSUMER BEHAVIOR."

9. eyeQ, Inc. abandoned the First Provisional Application in April of 2013.

10. Patent attorney Booth filed U.S. Provisional Patent Application 61/856,525 ("Second Provisional Application") on behalf of eyeQ on July 19, 2013. The Second Provisional Application is titled "SYSTEM FOR MONITORING AND ANALYZING CONSUMER PURCHASING BEHAVIOUR IN REAL-TIME TO DRIVE SALES VIA ENGAGING DIGITAL CUSTOMER EXPERIENCES."

11. Jim Wang ("Wang") is listed as a co-inventor on the Second Provisional Application.

12. All of the Asserted Patents claim priority to the Second Provisional Application.

13. Garel and Wang are listed as coinventors on each of the Asserted Patents.

14. When Alpha Modus filed its Complaint, Alpha Modus was prosecuting U.S. Patent Application Serial No. 18/905,975 (the "'975 Application"). See Dkt. 1 at pgs. 1 and 26 to 28 of 60 and Exh. H to Alpha Modus' original Complaint.

15. Alpha Modus filed a First Amended Complaint (Dkt. 21) asserting infringement of U.S. Patent No. 12,423,718, which issued as a result of Alpha Modus' prosecution of the '975 Application.

**1) AVA White Paper**

16. With Intel's assistance, the government of Ontario published "White Paper: Anonymous Video Analytics (AVA) Technology and Privacy" ("AVA White Paper") in April of 2011. Exh. A. It states that AVA "technology uses pattern detection algorithms to scan real time video feeds, looking for patterns that match the software's understanding of faces." Exh. A at pg. 3. "For example, when women are detected to be looking at a screen, mapping AVA data against a real time media player means a hair coloring ad can be dynamically served. When the technology detects a male viewer, the player can be configured to instead serve a shaving product ad." Exh. A at pg. 4.

17. The front cover of the AVA White Paper contains the following figure ("Blue People Figure", see Exh. A).




18. The Blue People Figure on the first page of the Canadian White Paper (pictured above and at Exh. A AM0530913) was used by Garel in competition presentations in the spring of 2012. Note the language "Millions of pixels per second are analyzed to detect general traits of viewers anonymously" and the categories: age, gender, distance, and attentive.

**2) Garel and Harish Jayakumar**

19. In 2011 and 2012, Garel and Harish Jayakumar ("Jayakumar") were pursuing MBAs at the McCombs School of Business of the University of Texas at Austin ("UTA").

20. In January of 2012, Garel attended the National Retail Federation ("NRF") Annual Convention & Expo in New York and met with Intel.

21. Garel participated in the four following competitions before July 19, 2012: (1) Texas Venture Labs Investment Competition ("TVLIC") at the University of Texas at Austin; (2) New Venture Championship ("NVC") hosted by the University of Oregon's Lundquist College of Business; (3) Global Venture Labs Investment Competition ("GVLIC") at the University of

Texas at Austin; and (4) Eureka Park Challenge ("Eureka Park") hosted by the Consumer Electronics Association in New York City.

22. Participants in the TVLIC, NVC, and GVLIC competitions uploaded business plans using accounts operated by a company named Gust, Inc.

23. Gust, Inc. allowed participants to create webpages to explain and promote their business plans.

24. Garel was affiliated with three Gust, Inc. accounts: (1) https://gust.com/companies/eyeqcompany; (2) https://gust.com/companies/eyeqsolutions; and (3) https://gust.com/companies/retaileyeq.

### 3) Texas Venture Labs Investment Competition ("TVLIC") at UTA (Feb. 2012)

25. In 2012, Texas Venture Labs invited attendees to the TVLIC by email, webpage announcements, and its Facebook account.

26. The TVLIC rules also required competitors to submit electronic copies of their business plans by January 24, 2012. TVLIC competition rules stated that business plans and presentations were "open to the public" and that "[a]ny data or information discussed or divulged throughout the competition should be considered information that will enter the public domain," "including the business plan."

27. On information and belief, Garel and Jayakumar submitted the business plan identified at Exh. B (AlphaModus0540698 – 0540715) (the "TVLIC Business Plan") to the TVLIC in January of 2012.

28. On information and belief, the TVLIC Business Plan was distributed to those judging the competition and shared with TVLIC attendees and/or participants.

29. On information and belief, the TVLIC Business Plan was available to the public before July 19, 2012.

30. On information and belief, the TVLIC Business Plan was distributed to those judging the competition and was made publicly available.

31. Garel and Jayakumar presented the TVLIC Business Plan at the TVLIC competition in February 2012. On information and belief, Exh. C (AlphaModus 0529428 – 0529452) is a copy of the presentation that Garel and Jayakumar gave at the TVLIC competition.

32. On information and belief, a copy of the presentation Garel and Jayakumar gave at the TVLIC was shared with TVLIC attendees and/or participants.

33. On information and belief, the presentation Garel and Jayakumar gave at the TVLIC was available to the public before July 19, 2012.

34. eyeQ won the TVLIC, ensuring that it could present in the upcoming GVLIC. No 2nd, 3rd, or 4th place was awarded.

35. eyeQ's presentation at TVLIC was recorded by video and posted online at Vimeo in February of 2012 (VIMEO 0001 and AlphaModus 0546225) ("eyeQ TVL February 2012 Presentation").

36. On information and belief, the eyeQ TVL February 2012 Presentation was available to the public before July 19, 2012.

**4) New Venture Championship ("NVC") with University of Oregon (April 5-7, 2012)**

37. Garel and Jayakumar participated in the NVC, which was hosted by the University of Oregon's Lundquist College of Business on April 5-7, 2012.

38. Garel submitted a business plan to the NVC competition using the Gust system.

39. On information and belief, Exh. D (AlphaModus0529253-70) is the business plan that Garel submitted to the NVC competition (the "NVC Business Plan").

40. On information and belief, the NVC Business Plan was distributed to those judging the competition and shown to attendees and participants of the NVC.

41. On information and belief, the NVC Business Plan was available to the public before July 19, 2012.

42. The three-day NVC competition started with an evaluation of the previously submitted business plans and a "start-up round" involving an elevator pitch and a 30-minute presentation to the judges. As the competition progressed, the teams also participated in a trade show where they set up booths promoting their businesses. Like the TVL competition, the NVC guidelines specified that the competition and related presentations were open to the public and that teams should expect the submitted materials, including the business plans, to enter the public domain.

**5) First Provisional Application (April 11, 2012)**

43. Garel hired patent attorney Booth who filed the First Provisional Application on April 11, 2012.

44. The First Provisional Application included five figures. Figure 4 below (AlphaModus0539651) shows eyeQ data dated Monday, January 16, 2012 and a Home Depot logo ("Home Depot Chart"). A smaller version of this same chart was also included in Figure 1.




FIG. 4

45. The First Provisional Application included an appendix that, on information and belief, included parts of the presentation Garel prepared for NVC.

46. The appendix to the First Provisional Application also included the Home Depot Chart, the Blue People Figure Graphic, and a slide titled "Anonymous Video Analytics."

**6) Global Venture Labs Investment Competition ("GVLIC") at UTA (May 2012)**

47. The GVLIC competition information is linked to the same guidelines as the TVL webpages cited above, and the event was advertised as open to the public. An FAQ page for competitors explained that "[t]he Opening Round, Semifinals and Finals judges will all have a chance to evaluate your plan before your presentation."

48. On April 15, 2012, eyeQ submitted a business plan to the GVLIC competition, again using the Gust system.

49. On information and belief, the business plan that Garel submitted to GVLIC is Exh. E (AlphaModus0529552-69) (the "eyeQ Business Plan").

50. On information and belief, the eyeQ Business Plan was distributed to those judging the competition and shown to attendees of the GVLIC.

51. On information and belief, the eyeQ Business Plan was available to the public before July 19, 2012.

52. On Thursday May 3, 2012, there was a GVLIC trade show where the competitors manned displays showcasing their pitches in a large ballroom. The public was invited, and Garel manned a display for eyeQ.

53. On information and belief, Wang was also present at the GVLIC trade show and assisted Garel.

54. Garel presented in the first round of the GVLIC on May 4, 2012, but eyeQ was not selected to continue to the semifinals. The GVLIC Business Plan, however, won an award and $1,000.

55. On information and belief, the presentation eyeQ gave at the GVLIC is Exh. F (AlphaModus0529772 – 0529831).

56. On information and belief, a copy of the presentation Garel gave at GVLIC was distributed to one or more attendees of the GVLIC.

57. On information and belief, the presentation Garel gave at GVLIC was available to the public before July 19, 2012.

**7) Eureka Park Challenge ("Eureka Park") hosted by CEA (June 2012)**

58. In June of 2012, the Consumer Electronics Association ("CEA") hosted a competition called the Eureka Park Challenge in New York.

59. eyeQ was one of ten finalists to compete in the Eureka Park Challenge hosted by CEA.

60. On information and belief, Garel submitted eyeQ materials to the Eureka Park competition.

61. On information and belief, Garel gave live demonstrations at Eureka Park in June 2012.

62. On information and belief, Garel gave an on-stage pitch about eyeQ at Eureka Park in June 2012.

63. If eyeQ had won the Eureka Park competition in June 2012, it would have been invited to the Consumer Electronics Show in January of 2013.

**8) Second Provisional Application (July 19, 2013)**

64. On July 19, 2013, eyeQ filed the Second Provisional Application listing Garel and Wang as co-inventors.

65. The specification of the Second Provisional Application had seven figures, none of which match the figures from the First Provisional Application.

66. The Home Depot Chart was not included in the application figures for the Second Provisional Application. Instead, the abandoned First Provisional Application was added as an appendix that included the Home Depot Chart and the Blue People Figure.

**9) U.S. Patent Application (July 18, 2014)**

67. On July 18, 2014, eyeQ filed a U.S. utility patent application listing Garel and Wang as coinventors and on which each of the Asserted Patents is based.

68. The Blue People Figure was not included in the utility application filed with the USPTO on July 18, 2014.

69. The Home Depot Chart was not included in the utility application filed with the USPTO on July 18, 2014.

70. A comparison of the figures included and excluded in the first and second provisional and the utility application reveals a deliberate effort to avoid invalidation based on prior activities by eyeQ, Garel, and Intel, at least.

**10) Alpha Modus Holdings, Inc.**

71. Plaintiff Alpha Modus, Corp. is a wholly owned subsidiary of Alpha Modus Holdings, Inc.

72. Alpha Modus Holdings, Inc.'s securities are publicly traded on the Nasdaq Stock Market under the symbols "AMOD" and "AMODW".

73. As a condition of an investor's purchase of securities issued by Alpha Modus Holdings, Inc., Plaintiff was required to pledge its intellectual property, including the Asserted Patents, as collateral securing obligations to the investor.

**COUNT I**
**(INVALIDITY OF CLAIMS OF ASSERTED PATENTS)**

74. Kroger realleges and incorporates each and every paragraph of this Counterclaim as it is set forth herein verbatim.

75. By virtue of Alpha Modus' filing of the original and First Amended Complaint, an actual case or controversy exists between Kroger and Alpha Modus regarding the validity of the claims of the Asserted Patents.

76. All the claims of the Asserted Patents are invalid for failing to comply with the conditions of patentability set forth in the patent laws of the United States, 35 U.S.C. § 100, et seq., including without limitation, at least 35 U.S.C. §§ 101, 102, 103, and/or 112. More specifically, and without limitation, the claims of the Asserted Patents are invalid under 35 U.S.C. §§ 102 and/or 103 because they are anticipated or rendered obvious by relevant prior art, including, but not limited to, prior art of record during prosecution of the Asserted Patents and/or

additional prior art that will be identified during discovery in this case. The claims of the Asserted Patents are also invalid under 35 U.S.C. § 112(a)/first paragraph because the specification does not contain a written description of the claimed invention sufficient enough to enable any person skilled in the art to which it pertains. The claims of the Asserted Patents are also invalid under 35 U.S.C. § 112(b)/second paragraph because the claims do not particularly point out and distinctly claim the subject matter regarded as the invention.

77. Kroger served Invalidity Contentions on January 16, 2026 and relies on those and any supplementations or amendments thereto herein.

**COUNT II**
**(NON-INFRINGEMENT OF THE ASSERTED PATENTS)**

78. Kroger realleges and incorporates each and every paragraph of this Counterclaim as it is set forth herein verbatim.

79. By virtue of Alpha Modus' filing of the original and First Amended Complaint herein, an actual case or controversy exists between Kroger and Alpha Modus.

80. Kroger has not and does not infringe any claim of any Asserted Patent, either directly or indirectly, literally, or under the doctrine of equivalents. No claim of an Asserted Patent is directly infringed nor does Kroger have the specific intent required to prove indirect infringement.

81. Kroger is entitled to a judicial declaration and order that it has not infringed any valid, enforceable claim of the Asserted Patents, directly or indirectly, either literally or under the doctrine of equivalents.

## COUNT III
## (INEQUITABLE CONDUCT)

82. Kroger realleges and incorporates each and every paragraph of this Counterclaim as it is set forth herein verbatim.

83. The inequitable conduct detailed below was pervasive and persistent throughout the prosecution of all Asserted Patents. The named inventors knew of the prior art, which anticipated or rendered obvious the claims of each Asserted Patent, and intentionally withheld it from the USPTO with the specific intent to deceive the Office. But for that withholding, the USPTO would not have allowed those claims. Accordingly, each Asserted Patent is unenforceable in its entirety.

### 1) The Inventors Withheld the EyeQ Prior Art and AVA White Paper During Prosecution of the Asserted Patents With Deceptive Intent

84. As inventors, Garel and Wang each had a duty to disclose information material to patentability to the USPTO during the prosecution of the Asserted Patents. *See, e.g.,* 37 C.F.R. §1.56.

85. The eyeQ Business Plan (AlphaModus0529552–69) (Exh. E) is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

86. Garel and Wang were aware of the eyeQ Business Plan during the pendency of the patent applications resulting in each of the Asserted Patents.

87. Garel and Wang knew that the eyeQ Business Plan was prior art to the Asserted Patents during the pendency of each of the Asserted Patents.

88. Garel and Wang never disclosed the eyeQ Business Plan to the USPTO during the pendency of any of the Asserted Patents.

89. The information disclosed in the eyeQ TVL February 2012 Presentation video (VIMEO 0001; AlphaModus 0546225) is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

90. Garel was aware of the eyeQ TVL February 2012 Presentation during the pendency of the patent applications resulting in each of the Asserted Patents.

91. Garel knew that the eyeQ TVL February 2012 Presentation was prior art to the Asserted Patents during the pendency of the patent applications resulting in each of the Asserted Patents.

92. Garel never disclosed the eyeQ TVL February 2012 Presentation to the USPTO during the pendency of the patent applications resulting in each of the Asserted Patents.

93. The NVC Business Plan (AlphaModus0529253-70) (Exh. D) is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

94. Garel was aware of the NVC Business Plan during the pendency of the patent applications resulting in each of the Asserted Patents.

95. Garel knew that the NVC Business Plan was prior art to the Asserted Patents during the pendency of the patent applications resulting in each of the Asserted Patents.

96. The NVC Business Plan was never disclosed to the USPTO during the pendency of the patent applications resulting in each of the Asserted Patents.

97. Garel failed to disclose the eyeQ Business Plan (Exh. E), eyeQ TVL February 2012 Presentation, and/or NVC Business Plan (Exh. D) (collectively "EyeQ Prior Art") to the USPTO during the pendency of the patent applications resulting in each of the Asserted Patents despite being personally aware of the EyeQ Prior Art. Indeed, he was responsible for and personally participated in the public disclosure of the EyeQ Prior Art. Garel made all of these prior art disclosures before July 19, 2012 (i.e., more than one year before the Asserted Patents' earliest potential priority date). On information and belief, substantively similar business plan and

technical details were presented at other pitch, fundraising, and/or business competition events, which constituted further occurrences of Garel making such EyeQ Prior Art information known to the public more than a year before the earliest claimed priority date of the Asserted Patents.

98. The AVA White Paper (AlphaModus0530913-20) (Exh. A) is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

99. Garel and/or Wang was aware of the AVA White Paper during the pendency of the patent applications resulting in each of the Asserted Patents.

100. Garel and/or Wang knew that the AVA White Paper was prior art to the Asserted Patents during the pendency of the patent applications resulting in each of the Asserted Patents.

101. Garel and/or Wang never disclosed the AVA White Paper to the USPTO during the pendency of the patent applications resulting in each of the Asserted Patents.

102. Garel and/or Wang failed to disclose the AVA White Paper to the USPTO during the pendency of the patent applications resulting in each of the Asserted Patents despite being personally aware of the AVA White Paper. Indeed, as discussed above, Garel was in communication with Intel about the technology disclosed in the AVA White Paper and was personally aware of the AVA White Paper.

103. On information and belief, Garel and/or Wang knew that if he disclosed either the EyeQ Prior Art or the AVA White Paper, he would not have been able to obtain allowance of the claims of the Asserted Patents. Garel was a founder of eyeQ and had a personal vested interest in its success, which on information and belief provided him with at least a financial incentive to withhold that prior art.

104. eyeQ filed the First Provisional Application on April 11, 2012, which was before or within a year after the EyeQ Prior Art was published and/or publicly disclosed. On information

and belief, Garel and/or Wang knew the importance of filing a patent application without waiting too long after the public disclosure, and specifically the potential impact a public disclosure would have on a later filed application.

105. eyeQ and Garel and/or Wang did not file any further applications claiming priority to the First Provisional Application, and it was allowed to expire.

106. The First Provisional Application attached selected slides from eyeQ's previous competition presentations. That attachment included a slide titled "Anonymous Video Analytics." See AlphaModus0539517. An image of the same is included below:




107. That image was taken directly from the AVA White Paper. AVA White Paper at AlphaModus0530913. A copy of that image from the AVA White Paper is below, confirming their identity:




108. This wholesale copying from the AVA White Paper confirms Garel and/or Wang was aware of it and understood it was material. This image was also included to provide support for the alleged invention in that First Provisional Application.

109. The Second Provisional Application incorporated the abandoned First Provisional Application by reference and included a copy of the First Provisional Application as an appendix. Thus, the Second Provisional Application also included the presentation slide titled "Anonymous Video Analytics" that was taken from the AVA White Paper (AlphaModus0372600).

110. On July 18, 2014, Garel and Wang filed U.S. Patent Application Ser. No.14/335,429 (the "'429 application"), which eventually issued as the '571 Patent. The image taken from the AVA White Paper was omitted from the '429 application's figures. It was also never included in the figures of any application for other Asserted Patents.

111. On information and belief, Garel and/or Wang knew that identifying the AVA White Paper would be damaging to his/their chances of obtaining a patent for himself/themselves and

EyeQ. Thus, on information and belief, he/they deliberately omitted that image from the non-provisional application with deceptive intent, including to avoid it leading the Examiner to identify the AVA White Paper. See AlphaModus0009020 at 0009021. Neither Garel nor Wang did anything else to disclose the AVA White Paper to the USPTO during the prosecution of the Asserted Patents. On information and belief, withholding of the AVA White Paper was done with deceptive intent.

112. As referenced above, the First and Second Provisional Applications contained pared down versions of the eyeQ competition presentations, which on information and belief contained slides that were the same or substantively the same as those that Garel and/or Wang had publicly disclosed as a part of the EyeQ Prior Art.

113. Those slides were conspicuously omitted from the figures of all the applications that resulted in the Asserted Patents.

114. The First Provisional Application included Figure 4, which appears to be copied from one of the attached presentation slides. Both Figure 4 and the matching presentation slide concern Home Depot:




FIG. 4

115. The First Provisional Application Figure 4 and the attached Home Depot presentation slide also match a slide that was part of the EyeQ Prior Art:



eyeQ Business Plan at 14 (AlphaModus0529566) (Exh. E); see also NVC Business Plan at 14 (Exh. D) (same).

116. The eyeQ Home Depot slide included a January 2012 date in the data. On information and belief, Garel and/or Wang chose to omit this slide from the non-provisional application(s) resulting in the Asserted Patents because that January 2012 date would have drawn attention to the slide and raised questions as to what activity Garel and/or Wang had engaged in over a year before the Asserted Patents' earliest claimed July 19, 2013 priority date.

117. On information and belief, Garel and/or Wang knew that identifying the EyeQ Prior Art would be damaging to his/their chances of obtaining a patent. Thus, on information and belief he/they deliberately omitted that EyeQ Prior Art material from the non-provisional application with deceptive intent, including to avoid it leading the Examiner to identify the EyeQ Prior Art. See also AlphaModus0009020 at 0009035. Neither Garel nor Wang did anything else to disclose the EyeQ Prior Art to the USPTO during the prosecution of the Asserted Patents. On information and belief, withholding of the EyeQ Prior Art was done with deceptive intent.

### 2) The Withheld Prior Art Was Material and Non-Cumulative and But For Its Concealment the USPTO Would Not Have Allowed The Asserted Patents

118. The EyeQ Prior Art was material to patentability and had Garel and/or Wang disclosed the EyeQ Prior Art to the USPTO, the Examiner would not have allowed the claims of the Asserted Patents.

#### a. Materiality As To The '571 Patent[1]

119. As an example, with respect to the '571 Patent, the EyeQ Prior Art anticipated and/or rendered obvious at least claims 1, 2, 4-13, 15-18, 20, 21, 23, 26, 27 of the '571 Patent. *See* Exh. G (invalidity claim chart).

120. The EyeQ Prior Art was not cumulative of the prior art considered by the Examiner because the Examiner had no prior art that anticipated the claims. At best, the Examiner had to cite multiple prior art references to make an initial rejection of obviousness. '571 Patent prosecution history, *passim*. Anticipatory prior art that teaches all the elements of the claims is more relevant than (and thus not cumulative of) references that each only teach part of the claimed subject matter and need to be combined.

121. As another example, with respect to the '571 Patent, the AVA White Paper (Exh. A) anticipated and/or rendered obvious at least claims 1, 2, 4-13, 15-18, 20, 21, 23, 26, 27 of the '571 Patent. *See* Exh. O (invalidity claim chart).

122. The AVA White Paper also was not cumulative of the prior art considered by the Examiner because the Examiner had no prior art that anticipated the claims. At best, the

[1] The headings herein referencing the specific patents are not intended to limit to the inequitable conduct or the effect of unenforceability to any individual patents or patents. Instead, they are provided to organize the pervasive and consistent conduct that occurred throughout the entire patent family and identify where the various instances of misconduct occurred.

Examiner had to cite multiple prior art references to make an initial rejection of obviousness. '571 Patent prosecution history, *passim*.

123. Moreover, Garel and/or Wang through his/their lawyer argued that the prior art did not teach the steps of determining a demographic characteristic of a person (i.e., gender, approximate age, or sentiment) based upon one or more video images captured by the one or more video image devices, which is required by claim 1. '571 Patent Prosecution History, 9/22/17 Amendment at 28.

124. That is a false statement because the EyeQ Prior Art taught exactly that. See, e.g., eyeQ Business Plan at 5 ("The information captured includes consumer demographics") (Exh. E); eyeQ TVL February 2012 Presentation (VIMEO 0001; AlphaModus 0546225) at 7:19-7:30 (collecting demographic information including sex ("FEMALE"), ethnicity ("WHITE"), and approximate age ("30-34")) and 9:01-9:33 ("Technology is called AVA, and it's an existing technology. Anonymous video analytics. It takes the video and grabs the consumer demographics;" "Intel").

125. On information and belief, Garel and/or Wang made that statement through his/their attorney knowingly with a deliberate intent to conceal the truth that such subject matter has already been disclosed more than a year before the '571 Patent's earliest priority date as part of the EyeQ Prior Art, including at the TVL event and in the video thereof posted to the Internet more than a year before the earliest filing date.

126. The EyeQ Prior Art's teaching of the steps of determining a demographic characteristic of a person (i.e., gender, approximate age, sentiment) based upon one or more video images captured by the one or more video image devices also makes it non-cumulative. Specifically, it

provides that teaching that was argued as missing from the prior art during the prosecution, and therefore it provides information that was not available to the original Examiner.

127. Garel's and/or Wang's statement through his/their attorney to the USPTO that the prior art failed to disclose determining a demographic characteristic of a person (i.e., gender, approximate age, sentiment) based upon one or more video images was also false because the AVA White Paper also taught exactly that. AVA White Paper at 1; id. at 3 ("The technology is also increasingly adept at parsing detected faces by gender and age range."); id. at 4 ("Those detection algorithms are based on the software having statistically 'learned' face patterns, by being trained on an audience database of thousands of face images. The data it compiles includes numbers of faces (also known as 'impressions'), timing and the duration that faces look, location in the field of view, size of faces and estimated gender and age bracket.").

128. On information and belief, Garel and/or Wang knew that was not a true statement and on information and belief that statement was made knowingly with a deliberate intent to conceal the truth that the AVA White Paper taught that feature in the prior art along with all other features of the claims.

129. The AVA White Paper's teaching of the steps of determining a demographic characteristic of a person based upon one or more video images captured by the one or more video image devices also makes it non-cumulative. Specifically, it provides that teaching that was argued as missing from the prior art during the prosecution, and therefore it provides information that was not available to the original Examiner.

130. Garel and/or Wang through his/their lawyer also argued during the prosecution of the '571 Patent that the advantage of the alleged invention is that it is able to determine the demographic characteristic of the person without the person ever having to register or provide

such information. That is no advantage of the alleged invention relative to the prior art because Garel and/or Wang had already put that feature into the public domain as part of the EyeQ Prior Art more than one year before the earliest priority date. See, e.g., eyeQ Business Plan at 5 ("The information captured includes consumer demographics"); eyeQ TVL February 2012 Presentation (VIMEO 0001; AlphaModus 0546225) at 7:19-7:30 (collecting demographic information including sex ("FEMALE"), ethnicity ("WHITE"), and approximate age ("30-34")) and 9:01-9:33 ("Technology is called AVA, and it's an existing technology. Anonymous video analytics. It takes the video and grabs the consumer demographics;" "Intel"). On information and belief, Garel and/or Wang withheld the EyeQ Prior Art to avoid its teachings, including this feature, from being used in a rejection against the patent application.

131. The EyeQ Prior Art's teaching of determining the demographic characteristic of the person without the person ever having to register or provide such information also makes it non-cumulative. Specifically, it provides that teaching that was argued as missing from the prior art during the prosecution, and therefore it provides information that was not available to the original Examiner.

132. During the prosecution of the '571 Patent, Garel and/or Wang through his/their lawyer also falsely represented that "Nor is there any motivation to use a demographic intelligence module that determines a demographic characteristic of a person (gender, age, or and/or sentiment) based upon one or more video images captured by the one or more video image devices." '571 Patent Prosecution History, 9/22/17 Amendment at 35-36.

133. That is a false statement because the EyeQ Prior Art clearly put that concept in the public domain as prior art. Specifically, the EyeQ Prior Art shows that Garel and/or Wang had publicly disclosed the idea of using a demographic intelligence module that determines a

demographic characteristic of a person (gender, age, and/or sentiment) based upon one or more video images captured by the one or more video image devices. See, e.g., eyeQ Business Plan at 5 ("The information captured includes consumer demographics"); eyeQ TVL February 2012 Presentation (VIMEO 0001; AlphaModus 0546225) at 7:19-7:30 (collecting demographic information including sex ("FEMALE"), ethnicity ("WHITE"), and approximate age ("30-34")) and 9:01-9:33 ("Technology is called AVA, and it's an existing technology. Anonymous video analytics. It takes the video and grabs the consumer demographics;" "Intel").

134. The EyeQ Prior Art's teaching of using a demographic intelligence module that determines a demographic characteristic of a person (gender, age, and/or sentiment) based upon one or more video images captured by the one or more video image devices also makes it non-cumulative. Specifically, it provides that teaching that was argued as missing from the prior art during the prosecution, and therefore it provides information that was not available to the original Examiner.

135. The contention of no motivation to use demographic intelligence is also a false statement because the AVA White Paper that was intentionally withheld clearly put that concept in the public domain as prior art. Specifically, the AVA White Paper showed that it was known in the prior art to use a demographic intelligence module that determines a demographic characteristic of a person (gender, age, and/or sentiment) based upon one or more video images captured by the one or more video image devices. AVA White Paper at 1; *id.* at 3 ("The technology is also increasingly adept at parsing detected faces by gender and age range."); *id.* at 4 ("Those detection algorithms are based on the software having statistically 'learned' face patterns, by being trained on an audience database of thousands of face images. The data it

compiles includes numbers of faces (also known as 'impressions'), timing and the duration that faces look, location in the field of view, size of faces and estimated gender and age bracket.").

136. The AVA White Paper's teaching of using a demographic intelligence module that determines a demographic characteristic of a person (gender, age, and/or sentiment) based upon one or more video images captured by the one or more video image devices also makes it non-cumulative. Specifically, it provides that teaching that was argued as missing from the prior art during the prosecution, and therefore it provides information that was not available to the original Examiner.

137. The Examiner also included the demographic analysis that analyzes demographic characteristics as part of his reasons for allowance, further confirming it was material to the allowance of the '571 Patent. '571 Patent Prosecution History, Notice of Allowance at 3, 4.

138. That was not the only false statement about the reasons a POSITA knows about using techniques in the prior art. Garel and/or Wang through his/their attorney also argued: "Nor is there any motivation to use a tracking module to track movements of the person within a predetermined area at the location." '571 Patent Prosecution History, 9/22/17 Amendment at 36.

139. Again, that is a false statement because Garel and/or Wang had publicly disseminated that very feature as part of the EyeQ Prior Art. Specifically, Garel and/or Wang had publicly disclosed as part of his business pitch that it was desirable to use a tracking module to track customers in the area of a product of interest (a predetermined area at the location). *See, e.g.,* eyeQ Business Plan at 5 ("AtShelf will continuously process behavior data for every consumer walking by and interacting with product on the shelf. The information captured includes consumer demographics, the order in which products are selected, time spent with each product, promotions offered, and what product they walked off with."); *id*. at 6 ("eyeQ's software will use

a combination of these inputs to determine, real time, a personalized marketing campaign for the current consumer at the shelf."); eyeQ TVL February Presentation (VIMEO 0001; AlphaModus 0546225) at 7:19-7:30 (tracking person and their movement relative to the camera, as demonstrated by the green box tracking the person's movement relative to the camera).

140. The EyeQ Prior Art's teaching of using a tracking module to track customers in the area of a product of interest (a predetermined area at the location), as identified above, also makes it non-cumulative. Specifically, it provides that teaching that was argued as missing from the prior art during the prosecution, and therefore it provides information that was not available to the original Examiner.

141. Garel and/or Wang likewise argued that "tracking the movement of the persons relative to the one or more information monitoring devices" was an inventive feature. '571 Patent Prosecution History, 2/8/19 Response to Final Office Action at 31. He or they also argued that tracking eye movement was novel and inventive.

142. That is likewise not true because the AVA White Paper disclosed both tracking persons and specifically tracking eye movement. AVA White Paper at 1; *id*. at 4 (tracking a person's "location in the field of view"); *id*. at 6 ("R&D work is also starting to test such new variables as the emotions of detected faces, and which way eyes are pointed when looking at a screen.").

143. The Examiner also included the feature of tracking the persons as a reason for allowance, further confirming it was material to the allowance of the '571 Patent. '571 Patent Prosecution History, Notice of Allowance at 5.

144. As another example, Garel and/or Wang, through his/their attorney, asserted that an "opt-out" limitation distinguished a claim from the prior art. '571 Patent Prosecution History, 9/22/17 Response at 29. That is not true because the AVA White Paper disclosed this "opt-out"

limitation. AVA White Paper at 6 (AlphaModus0530918) ("Individual Participation: Consumers should have the right to opt out (with AVA, notice on site means consumers can choose to avoid the screens and sensors)"); Exhibit O at Limitations 1.H and 1.I. Moreover, the AVA White Paper provides an express motivation to include such an opt-out limitation in a prior art system (e.g., to "[r]espect ... user privacy"). AVA White Paper at 6. Independent claim 1 of the '571 patent included an "opt-out" limitation, so the AVA White Paper was material to claim 1 of the '571 Patent.

145. If Garel and/or Wang had been forthcoming and disclosed the EyeQ Prior Art to the Examiner, the Examiner would not have allowed the claims of the '571 Patent. Specifically, the Examiner would have known that that purported differences between the prior art and the claims of the '571 Patent were in fact neither novel nor non-obvious, and thus the Examiner would have rejected the claims. Also, if the EyeQ Prior Art had been disclosed, the Examiner would have known that the arguments of no reason to combine the prior art were false because the EyeQ Prior Art put the reasons to use the features claimed in the '571 Patent into the public domain (e.g., providing more effective, personalized marketing/advertising to consumers by using real-time demographic information to personalize advertising). Thus, the Examiner would not have accepted those arguments and would have rejected the claims. Moreover, because the EyeQ Prior Art anticipates the claims, such arguments about no reason to combine would have been irrelevant, as there is no need to address a reason to combine when addressing an anticipatory reference.

146. The EyeQ Prior Art was therefore material to the patentability of the claims of the '571 Patent, and but for the failure to disclose the EyeQ Prior Art the USPTO would not have allowed the claims of the '571 Patent. The EyeQ Prior Art is also not cumulative because it provided the

teachings that were argued as lacking in the prior art and refuted the arguments Garel and/or Wang made through his/their lawyer.

147. Similarly, if Garel and/or Wang had been forthcoming and disclosed the AVA White Paper to the Examiner, the Examiner would not have allowed the claims of the '571 Patent. Specifically, the Examiner would have known that that purported differences between the prior art and the claims of the '571 Patent were in fact neither novel nor non-obvious, and thus the Examiner would have rejected the claims. Also, if the AVA White Paper had been disclosed, the Examiner would have known that the arguments that there was no reason to combine the prior art were false because the AVA White Paper put the reasons to use the features claimed in the '571 Patent into the public domain (e.g., providing more effective, personalized marketing/advertising to consumers by using real-time demographic information to personalize advertising). Thus, the Examiner would not have accepted those arguments and would have rejected the claims. Moreover, because the AVA White Paper anticipates the claims, such arguments about no reason to combine would have been irrelevant, as there is no need to address a reason to combine when addressing an anticipatory reference.

148. The AVA White Paper was therefore material to the patentability of the claims of the '571 Patent, and, but for the failure to disclose the AVA White Paper, the USPTO would not have allowed the claims of the '571 Patent. The AVA White Paper is also not cumulative because it provided the teachings that were argued as lacking in the prior art and refuted the arguments Garel and/or Wang made through his/their lawyer.

149. Garel's and/or Wang's misrepresentations and withholding of prior art also tainted the remainder of the patent family, i.e., every application that claimed priority back to the application that issued as the '571 Patent.

150. As another example, during the prosecution of the next patent in the family, the '825 Patent, neither Garel nor Wang nor their attorney disclosed the EyeQ Prior Art to the USPTO.

151. The EyeQ Prior Art was material to patentability and had Garel and/or Wang disclosed the EyeQ Prior Art to the USPTO, the Examiner would not have allowed the claims of the Asserted Patents.

**b. Materiality As To The '825 Patent**

152. For example, the EyeQ Prior Art anticipated and/or rendered obvious at least claims 1-5, 7-11, 13-15, 17, 19-23 of the '825 Patent. *See* Exhibit H.

153. The EyeQ Prior Art was not cumulative of the prior art considered by the Examiner during the prosecution because the Examiner had no prior art that anticipated the claims.

154. Further, during the prosecution of the next patent in the family, the '825 Patent, neither Garel nor Wang nor their attorney disclosed the AVA White Paper (Exh. A) to the USPTO.

155. The AVA White Paper was material to patentability and had Garel and/or Wang disclosed the AVA White Paper to the USPTO, the Examiner would not have allowed the claims of the Asserted Patents.

156. For example, the AVA White Paper anticipated and/or rendered obvious at least claims 1-5, 7-11, 13-15, 17, 19-23 of the '825 Patent. *See* Exhibit P.

157. The AVA White Paper was not cumulative of the prior art considered by the Examiner during the prosecution because the Examiner had no prior art that anticipated the claims.

158. During the prosecution of the '825 Patent, the Examiner did not reject the claims over the prior art. Instead, the only rejection was for double-patenting over the '571 Patent, meaning the claims were obvious variants of one another.

159. The Examiner allowed claim 1 of the '825 Patent (then application claim 27) because the claims recited the steps of analyzing the demographics and tracking information plus

utilizing the real time analysis to select a sales associate from a group of sales associates at the retail store. ‘825 Patent Prosecution History, Notice of Allowance at 2-3.

160. If the Examiner had known about the EyeQ Prior Art, the Examiner would not have allowed application claim 27 of the ‘825 Patent (now claim 1). That is because those purported reasons for allowance were already in the public domain by virtue of Garel and/or Wang having put the EyeQ Prior Art in the public domain.

161. More specifically, if the Examiner had been aware of the EyeQ Prior Art the Examiner would have rejected that claim as being anticipated by the EyeQ Prior Art, or at least it would have been obvious.

162. Even if the EyeQ Prior Art did not anticipate, if the Examiner had the EyeQ Prior Art, the Examiner would not have allowed the claims of the ‘825 Patent on the basis that the prior art lacked the steps of analyzing the demographics and tracking information plus utilizing the real time analysis to select a sales associate from a group of sales associates at the retail store. That is because those features were expressly disclosed in the EyeQ Prior Art, which Garel and/or Wang put into the public domain and failed to disclose to the USPTO. *See* eyeQ Business Plan at 5 (“The information captured includes consumer demographics” and “eyeQ AtShelf will capture consumer behavior using video cameras installed at or nearby a retailer's shelf. This information captured is analyzed using eyeQ's real-time video analytics algorithms. AtShelf will continuously process behavior data for every consumer walking by and interacting with product on the shelf. The information captured includes consumer demographics, the order in which products are selected, time spent with each product, promotions offered, and what product they walked off with.”); *id.* at 14 (tracking movement of the person relative to the camera, as demonstrated by tracking movement of the person relative to the product (e.g., picking up a

product)); eyeQ TVL February 2012 Presentation (VIMEO 0001; AlphaModus 0546225) at 7:19-7:30 (collecting demographic information including sex ("FEMALE"), ethnicity ("WHITE"), and approximate age ("30-34")) and at 9:01-9:33 ("Technology is called AVA, and it's an existing technology. Anonymous video analytics. It takes the video and grabs the consumer demographics;" "Intel"); Exhibit H.

163. The EyeQ Prior Art's teaching of the steps of analyzing the demographics and tracking information plus utilizing the real time analysis to select a sales associate from a group of sales associates at the retail store also makes it non-cumulative. Specifically, it provides that teaching that the Examiner said was missing from the prior art during the prosecution, and therefore it provides information that was not available to the original Examiner.

164. The Examiner also allowed claim 15 of the '825 Patent (then application claim 41) because of the steps of analyzing the information for an object interacted with by the person and tracking information in addition to utilizing the real time analysis to monitor the movement of the first person, the product, or both within the retail store. '825 Patent Prosecution History, Notice of Allowance at 3.

165. If the Examiner had known about the EyeQ Prior Art, the Examiner would not have allowed application claim 41 of the '825 Patent (now claim 15). *See* Exhibit H. That is because those purported reasons for allowance were already in the public domain by virtue of Garel and/or Wang having put the EyeQ Prior Art in the public domain.

166. More specifically, if the Examiner had been aware of the EyeQ Prior Art, the Examiner would have rejected that claim as being anticipated by the EyeQ Prior Art.

167. Even if the EyeQ Prior Art did not anticipate, if the Examiner had the EyeQ Prior Art, the Examiner would not have allowed the claims on the basis that the prior art lacked the steps of

analyzing the information for an object interacted with by the person and tracking information in addition to utilizing the real time analysis to monitor the movement of the first person, the product, or both within the retail store. That is because those features were expressly disclosed in the EyeQ Prior Art, which Garel and/or Wang put into the public domain and failed to disclose to the USPTO. See eyeQ Business Plan at 5 ("eyeQAtShelf will capture consumer behavior using video cameras installed at or nearby a retailer's shelf. This information captured is analyzed using eyeQ's real-time video analytics algorithms. AtShelf will continuously process **behavior data** for every consumer walking by and **interacting with product on the shelf**. **The information captured includes** consumer demographics, **the order in which products are selected, time spent with each product, promotions offered, and what product they walked off with.**"(emphasis added)); eyeQ TVL February 2012 Presentation (VIMEO 0001; AlphaModus 0546225) at 7:05-7:40 (system recognizing in real time that the person interacted with and picked up a Ryobi or DeWalt drill, with the drill being specifically identified (and enclosed within a red box and labeled)); Exhibit H.

168. The EyeQ Prior Art's teaching of the steps of analyzing the information for an object interacted with by the person and tracking information in addition to utilizing the real time analysis to monitor the movement of the first person, the product, or both within the retail store, also makes it non-cumulative. Specifically, it provides that teaching that the Examiner said was missing from the prior art during the prosecution, and therefore it provides information that was not available to the original Examiner.

169. The EyeQ Prior Art was therefore material to the patentability of the claims of the '825 Patent, and but for the failure to disclose the EyeQ Prior Art the USPTO would not have allowed the claims of the '825 Patent. The EyeQ Prior Art is also not cumulative because it provided the

teachings that the Examiner said were lacking in the prior art available to him. The outcome would have been entirely different because the Examiner would have had the evidence that those teachings were known in the art and thus would not have allowed the '825 Patent claims had Garel and/or Wang complied with his/their duty of disclosure.

170. Likewise, if the Examiner had been aware of the AVA White Paper the Examiner would have rejected at least claims 1-5, 7-11, 13-15, 17, 19-23 as being anticipated by and/or obvious over the AVA White Paper. *See* Exhibit P.

171. Even if the AVA White Paper did not anticipate, if the Examiner had the AVA White Paper the Examiner would not have allowed the claims on the basis that the prior art lacked the steps of analyzing the information for an object interacted with by the person and tracking information in addition to utilizing the real time analysis to monitor the movement of the first person, the product, or both within the retail store. That is because those features were expressly disclosed in the AVA White Paper. *See* AVA White Paper at 1; *id.* at 4 (tracking the person's "location in the field of view"); *id*. at 6 ("R&D work is also starting to test such new variables as the emotions of detected faces, and which way eyes are pointed when looking at a screen."); Exhibit P.

172. The AVA White Paper's teaching of the steps of analyzing the information for an object interacted with by the person and tracking information in addition to utilizing the real time analysis to monitor the movement of the first person, the product, or both within the retail store also makes it non-cumulative. Specifically, it provides that teaching that the Examiner said was missing from the prior art during the prosecution, and therefore it provides information that was not available to the original Examiner.

173. The AVA White Paper was therefore material to the patentability of the claims of the ‘825 Patent, and but for the failure to disclose the AVA White Paper, the USPTO would not have allowed the claims of the ‘825 Patent. The AVA White Paper is also not cumulative because it provided the teachings that the Examiner said were lacking in the prior art available to him. The outcome would have been entirely different because the Examiner would have had the evidence that those teachings were known in the art and thus would not have allowed the ‘825 Patent claims had Garel and/or Wang complied with his/their duty of disclosure.

**c. Materiality As To The ‘672 Patent**

174. As another example, Garel and/or Wang never disclosed the EyeQ Prior Art to the USPTO during the prosecution of the ‘672 Patent.

175. The EyeQ Prior Art was material to patentability and had Garel and/or Wang disclosed the EyeQ Prior Art to the USPTO, the Examiner would not have allowed the claims of the Asserted Patents.

176. For example, the EyeQ Prior Art anticipated at least claims 1, 6-11, and 13-18 of the ‘672 Patent. *See* Exhibit I.

177. The EyeQ Prior Art was not cumulative of the prior art considered by the Examiner during the prosecution of the ’672 Patent because the Examiner had no prior art that anticipated the claims.

178. Specifically, the Examiner allowed claims 1 and 11 of the ‘672 Patent for the reason that the prior art before him/her allegedly did not disclose the claim limitations reciting “identify, via image recognition, an inventory of one or more retail products physically located at the first visual display location in the retail store” and “generate a promotion of one or more of the one or more retail products physically located at the first visual display location for the customer based on behavioral analytics[.]” ‘672 Patent Prosecution History, Notice of Allowance at 2-3.

179. The Examiner allowed claim 17 of the ‘672 Patent for the reason that the prior art before him/her allegedly did not disclose the claim limitations reciting “ii) display, on the visual display at the given visual display location, information about one or more of the one or more retail products physically located at the given visual display location, (iii) determine, in real-time by the one or more server processors, current pricing information regarding the one or more retail products physically located at the given visual display location, (iv) display the current pricing information regarding the one or more retail products physically located at the given visual display location, and (v) receive, from the one or more information monitoring devices operable for gathering information for detecting customers at the given visual display location, activation of the given visual display to display a promotion of a retail product for a customer, wherein the retail product is physically located at the given visual display location.” ‘672 Patent Prosecution History, Notice of Allowance at 3-4.

180. The EyeQ Prior Art disclosed those claim limitations and Garel and/or Wang put those features in the public domain as part of the EyeQ Prior Art. *See* Exhibit I.

181. Specifically, the EyeQ Prior Art disclosed identifying inventory and generating a promotion based on behavioral analytics as required by claims 1 and 11. eyeQ TVL February 2012 Presentation (VIMEO 0001; AlphaModus 0546225) at 7:05-7:40 (system recognizing in real time that the person picks up a Ryobi or DeWalt drill, with the drill being specifically identified (and enclosed within a red box and labeled)), 7:25-44 (eyeQ system recognizing that “she picked up a DeWalt drill”; “this is one of the inputs” for eyeQ’s personalized marketing); eyeQ Business Plan at 5 (“eyeQAtShelf will capture consumer behavior using video cameras installed at or nearby a retailer's shelf. This information captured is analyzed using eyeQ's real-time video analytics algorithms. AtShelf will continuously process behavior data for every

consumer walking by and interacting with product on the shelf. The information captured includes consumer demographics, the order in which products are selected, time spent with each product, promotions offered, and what product they walked off with."), 3 ("used to determine effectiveness of store layout, inventory management, merchandising, at-shelf promotion, sales team positioning, and product feedback to the manufacturer"), 4 ("The decisions can include product promotions, placement, inventory levels to carry, staffing, and pricing."), 5 ("Generating Business Intelligence: eyeQ's analysis software will use the information gathered in the previous step along with certain business criteria set by the retailers to generate the business intelligence. Examples of business criteria could include current product inventory …."), 5-6 ("Generating Business Intelligence: eyeQ's analysis software will use the information gathered in the previous step along with certain business criteria set by the retailers to generate the business intelligence. Examples of business criteria could include current product inventory, historical sales, promotions and market analysis. eyeQ's software will use a combination of these inputs to determine, real time, a personalized marketing campaign for the current consumer at the shelf."), 6 ("This offering will also include integration into Oracle's retail inventory database management system."), and 14; Exhibit I.

182. The EyeQ Prior Art also disclosed the displaying, real time determining and pricing limitations in claim 17 the Examiner cited as the reason for allowance. eyeQ Business Plan at 5 ("Monitoring Consumer Purchase Behavior: eyeQ AtShelf will capture consumer behavior using video cameras installed at or nearby a retailer's shelf. This information captured is analyzed using eyeQ's real-time video analytics algorithms. AtShelf will continuously process behavior data for every consumer walking by and interacting with product on the shelf. The information captured includes consumer demographics, the order in which products are selected, time spent

with each product, promotions offered, and what product they walked off with.”), 5-6 (“Generating Business Intelligence: eyeQ's analysis software will use the information gathered in the previous step along with certain business criteria set by the retailers to generate the business intelligence. Examples of business criteria could include current product inventory, historical sales, promotions and market analysis. eyeQ's software will use a combination of these inputs to determine, real time, a personalized marketing campaign for the current consumer at the shelf.”), 6 (“The personalized marketing campaign based off of data analyzed real-time in the previous step is presented to the consumer at the shelf using digital signage. See Exhibit 4 for an implementation example of AtShelf. This campaign will aid and influence the consumer's purchasing decision. Information displayed may include, but is not limited to, comparisons between products the consumer has reviewed, additional product images, online reviews of products, benefits of purchasing in store, and price comparisons. Additionally, AtShelf will provide real time in-store promotions to the consumer to help close the deal. Our algorithm will determine the best promotion to provide the consumer based on factors generated in the business intelligence and limits set by the retailer.”), eyeQ TVL February 2012 Presentation (VIMEO 0001; AlphaModus 0546225) at 7:25-44 (eyeQ system recognizing that “she picked up a DeWalt drill”; identifying sentiment (as demonstrated by product interactions) and demographic information (including approximate age and sex) as “inputs” for eyeQ’s personalized marketing); eyeQ TVL February Presentation at 7:15-7:59, at 7:49 (“Here’s the price.”), 8:03 (stating that the consumer can game the system by picking up different drills to actively reduce the price in real time), 8:28-29 (“A special price. If you buy right now in the next 60 minutes, we can throw you a discount over here.”); Exhibit I.

183. Thus, the Examiner's very reason for allowance was not actually new, as evidenced by the EyeQ Prior Art.

184. Had the EyeQ Prior Art been cited to the USPTO, the Examiner would not have allowed the claims of the '672 Patent and instead would have rejected them as anticipated.

185. Even if the EyeQ Prior Art did not anticipate, if the Examiner had the EyeQ Prior Art the Examiner would not have allowed the claims for the reasons identified in the Notice of Allowance. That is because those features were expressly disclosed in the EyeQ Prior Art, which Garel and/or Wang put into the public domain and failed to disclose to the USPTO, as identified above.

186. The EyeQ Prior Art was therefore material to the patentability of the claims of the '672 Patent, and but for the failure to disclose the EyeQ Prior Art the USPTO would not have allowed the claims of the '672 Patent. The EyeQ Prior Art is also not cumulative because it provided the teachings that the Examiner said were lacking in the prior art available to him. The outcome would have been entirely different because the Examiner would have had the evidence that those teachings were known in the art and thus would not have allowed the '672 Patent claims had Garel and/or Wang complied with his duty of disclosure.

**d. Materiality As To The '890 Patent**

187. As another example, Garel and/or Wang never disclosed the EyeQ Prior Art to the USPTO during the prosecution of the '890 Patent.

188. The EyeQ Prior Art was material to patentability and had Garel and/or Wang disclosed the EyeQ Prior Art to the USPTO, the Examiner would not have allowed the claims of the Asserted Patents.

189. For example, the EyeQ Prior Art anticipated and/or rendered obvious at least claims 1-9 and 11-14 of the '890 Patent. *See* Exhibit J.

190. The EyeQ Prior Art was not cumulative of the prior art considered by the Examiner during the prosecution of the ’890 Patent because the Examiner had no prior art that anticipated the claims.

191. Specifically, the Examiner allowed the ‘890 Patent for the reason that the prior art before him/her allegedly did not disclose the claim limitations reciting “(c) providing a response in real time based upon the analyzed information gathered by the information monitoring devices, wherein the response is selected from a group consisting of (i) sending a communication to the person directing the person to a location in the retail store at which the person can interact with the product, (ii) engaging the person based upon the product, wherein the engaging is performed using one more displays and content being displayed on the one or more displays is selected based upon the product, (iii) sending a communication to a second person in the retail store who can then in real time interact with the person regarding the product, (iv) providing marketing or advertising information to the person in real time based upon the product, wherein the marketing or advertising information is either product to the person by a display at the retail store or by sending the marketing or advertising information to a mobile device of the person, and (v) providing a coupon to the person in real time based upon the product, wherein the coupon is either a printed out coupon or a digital coupon.” ‘890 Patent Prosecution History, Notice of Allowance at 3-4.

192. Everything in (i) through (v) above is an alternative, i.e., a Markush group, and thus prior art meeting any one of those would meet that claim limitation.

193. The EyeQ Prior Art disclosed those claim limitations and Garel and/or Wang put that feature in the public domain as part of the EyeQ Prior Art. Specifically, the EyeQ Prior Art disclosed numerous alternatives that would satisfy the allowable claim language. eyeQ Business

Plan at 3 ("used to determine effectiveness of store layout, inventory management, merchandising, at-shelf promotion, **sales team positioning**, and product feedback to the manufacturer"); *id*. at 4 ("The decisions can include product promotions, placement, inventory levels to carry, **staffing**, and pricing."), 6 ("The personalized marketing campaign based off of data analyzed real-time in the previous step is presented to the consumer at the shelf using digital signage. See Exhibit 4 for an implementation example of AtShelf. This campaign will aid and influence the consumer's purchasing decision. Information displayed may include, but is not limited to, comparisons between products the consumer has reviewed, additional product images, online reviews of products, benefits of purchasing in store, and price comparisons. Additionally, AtShelf will provide real time in-store promotions to the consumer to help close the deal. Our algorithm will determine the best promotion to provide the consumer based on factors generated in the business intelligence and limits set by the retailer."), and 14; eyeQ TVL February Presentation at 7:15-7:59 (eyeQ system recognizing that "she picked up a DeWalt drill"; identifying sentiment (as demonstrated by product interactions) and demographic information (including approximate age and sex) as "inputs" for eyeQ's personalized marketing, which is then displayed in real time on a display screen), 8:20-40 (responsively offering discount/coupon in real time); 26:45-27:15 (eyeQ system recognizes the product being touched by the person in real time ("immediately"); "When the customer essentially puts their hand on the product, it recognizes that a customer has touched the product. It knows what the product is."); NVC Business Plan (AlphaModus0529253-70) at 6-7 ("eyeQ Kiosk: eyeQ Kiosk will be one or more kiosks throughout the store. This will be the consumer's first touch-point in the store. The consumer will interact with this and based on inputs collected a personalized report consisting of

a store map with route, complementary products, promotional **coupons** will be provided. See Exhibit 4 for an example kiosk.”); Exhibit J.

194. Thus, the Examiner’s very reason for allowance was not actually new, as evidenced by the EyeQ Prior Art.

195. Had the EyeQ Prior Art been cited to the USPTO, the Examiner would not have allowed the claims of the ‘890 Patent and instead would have rejected them as anticipated.

196. Even if the EyeQ Prior Art did not anticipate, if the Examiner had the EyeQ Prior Art the Examiner would not have allowed the claims for the reasons identified in the Notice of Allowance. That is because those features were expressly disclosed in the EyeQ Prior Art, which Garel and/or Wang put into the public domain and failed to disclose to the USPTO, as identified above.

197. The EyeQ Prior Art was therefore material to the patentability of the claims of the ‘890 Patent, and but for the failure to disclose the EyeQ Prior Art the USPTO would not have allowed the claims of the ‘890 Patent. The EyeQ Prior Art is also not cumulative because it provided the teachings that the Examiner said were lacking in the prior art available to him. The outcome would have been entirely different because the Examiner would have had the evidence that those teachings were known in the art and thus would not have allowed the ‘890 Patent claims had Garel and/or Wang complied with his/their duty of disclosure.

198. As another example, Garel and/or Wang never disclosed the EyeQ Prior Art to the USPTO during the prosecution of the ‘880 Patent.

199. The EyeQ Prior Art was material to patentability and had Garel and/or Wang disclosed the EyeQ Prior Art to the USPTO, the Examiner would not have allowed the claims of the Asserted Patents.

**e. Materiality As To The ‘880 Patent**

200. For example, the EyeQ Prior Art anticipated and/or rendered obvious at least claims 1-3 and 13-17 of the ‘880 Patent. *See* Exhibit K.

201. The EyeQ Prior Art was not cumulative of the prior art considered by the Examiner during the prosecution of the ’880 Patent because the Examiner had no prior art that anticipated the claims.

202. Specifically, the Examiner allowed the ‘880 Patent for the reason that the prior art before him/her allegedly did not disclose the claim limitations reciting “(vi) the step of gathering information using the one or more information monitoring devices comprises (A) gathering product interaction information based upon product interactions the persons have with one or more products in the retail store, wherein the product interactions information comprises (I) the one or more products are picked up by the persons at the retail store, and (II) the one or more products are carried away by the persons at each of the retail store, and (B) gathering object identification information of the one or more products that the persons interacted with during the product interactions; (b) analyzing the information in real time using (A) the server, (B) the one or more databases, or (C) both gathered by the information monitoring devices about the shopping activities of the plurality of persons to manage inventory of the products in the retail store at the one or more product points, wherein the analyzed information comprises the product interaction information and the object identification information[.]” ‘880 Patent Prosecution History, Notice of Allowance at 2-3.

203. The EyeQ Prior Art disclosed those claim limitations and Garel and/or Wang put that feature in the public domain as part of the EyeQ Prior Art. *See* Exhibit K.

204. Specifically, the EyeQ Prior Art disclosed “(vi) the step of gathering information using the one or more information monitoring devices comprises (A) gathering product interaction

information based upon product interactions the persons have with one or more products in the retail store, wherein the product interactions information comprises (I) the one or more products are picked up by the persons at the retail store, and (II) the one or more products are carried away by the persons at each of the retail store, and (B) gathering object identification information of the one or more products that the persons interacted with during the product interactions[.]" eyeQ Business Plan at 5 ("eyeQAtShelf will capture consumer behavior using video cameras installed at or nearby a retailer's shelf. This information captured is analyzed using eyeQ's real-time video analytics algorithms. AtShelf will continuously process behavior data for every consumer walking by and interacting with product on the shelf. The information captured includes consumer demographics, the order in which products are selected, time spent with each product, promotions offered, and what product they walked off with."), 14 (tracking movement of the person relative to the camera, as demonstrated by tracking movement of the person relative to the product (e.g., picking up a product)); eyeQ TVL February 2012 Presentation (VIMEO 0001; AlphaModus 0546225) at 7:05-7:40 (system recognizing in real time the person's sentiment toward a particular product (e.g., interest in a Ryobi or DeWalt drill as evidenced by the person picking up a Ryobi or DeWalt drill, with the drill being specifically identified (and enclosed within a red box and labeled)), 7:25-44 (eyeQ system recognizing that "she picked up a DeWalt drill"; "this is one of the inputs" for eyeQ's personalized marketing), 21:50-22:20 (eyeQ identifies which product the person "touch[es]" or picks up); Exhibit K.

205. The EyeQ Prior Art also disclosed "(b) analyzing the information in real time using (A) the server, (B) the one or more databases, or (C) both gathered by the information monitoring devices about the shopping activities of the plurality of persons to manage inventory of the products in the retail store at the one or more product points, wherein the analyzed information

comprises the product interaction information and the object identification information[.]" eyeQ Business Plan at 5 ("AtShelf will continuously process behavior data for **<u>every consumer walking by</u>** and interacting with product on the shelf. The information captured includes consumer demographics, the order in which products are selected, time spent with each product, promotions offered, and what product they walked off with."), 5-6 ("Generating Business Intelligence: eyeQ's analysis software will use the information gathered in the previous step along with certain business criteria set by the retailers to generate the business intelligence. Examples of business criteria could include current product inventory, historical sales, promotions and market analysis. eyeQ's software will use a combination of these inputs to determine, real time, a personalized marketing campaign for the current consumer at the shelf."), 6 ("The personalized marketing campaign based off of data analyzed real-time in the previous step is presented to the consumer at the shelf using digital signage. See Exhibit 4 for an implementation example of AtShelf. This campaign will aid and influence the consumer's purchasing decision. Information displayed may include, but is not limited to, comparisons between products the consumer has reviewed, additional product images, online reviews of products, benefits of purchasing in store, and price comparisons. Additionally, AtShelf will provide real time in-store promotions to the consumer to help close the deal. Our algorithm will determine the best promotion to provide the consumer based on factors generated in the business intelligence and limits set by the retailer."); eyeQ TVL February 2012 Presentation (VIMEO 0001; AlphaModus 0546225) at 7:05-7:40, 7:25-44 (eyeQ system recognizing that "she picked up a DeWalt drill"; identifying sentiment (as demonstrated by product interactions) and demographic information (including approximate age and sex) as "inputs" for eyeQ's personalized marketing); Exhibit K.

206. Thus, the Examiner's very reason for allowance was not actually new, as evidenced by the EyeQ Prior Art.

207. Had the EyeQ Prior Art been cited to the USPTO, the Examiner would not have allowed the claims of the '880 Patent and instead would have rejected them as anticipated.

208. Even if the EyeQ Prior Art did not anticipate, if the Examiner had the EyeQ Prior Art the Examiner would not have allowed the claims for the reasons identified in the Notice of Allowance. That is because those features were expressly disclosed in the EyeQ Prior Art, which Garel and/or Wang put into the public domain and failed to disclose to the USPTO, as identified above.

209. The EyeQ Prior Art was therefore material to the patentability of the claims of the '880 Patent, and but for the failure to disclose the EyeQ Prior Art the USPTO would not have allowed the claims of the '880 Patent. The EyeQ Prior Art is also not cumulative because it provided the teachings that the Examiner said were lacking in the prior art available to him. The outcome would have been entirely different because the Examiner would have had the evidence that those teachings were known the in the art and thus would not have allowed the '880 Patent claims had Garel and/or Wang complied with his/their duty of disclosure.

**f. Materiality As To The '120 Patent**

210. The EyeQ Prior Art anticipated and/or rendered obvious at least claims 1-10, 12, and 14-17 of the '120 Patent. See Exhibit L.

211. The EyeQ Prior Art was not cumulative of the prior art considered by the Examiner during the prosecution because the Examiner had no prior art that anticipated the claims.

212. Had the EyeQ Prior Art been cited to the USPTO, the Examiner would not have allowed the claims of the '120 Patent and instead would have rejected them as anticipated and/or obvious.

213. Even if the EyeQ Prior Art did not anticipate, if the Examiner had the EyeQ Prior Art the Examiner would not have allowed the claims for the reasons identified in the Notice of Allowance. That is because those features were expressly disclosed in the EyeQ Prior Art, which Garel and/or Wang put into the public domain and failed to disclose to the USPTO, as identified above.

214. The EyeQ Prior Art was therefore material to the patentability of the claims of the '120 Patent, and but for the failure to disclose the EyeQ Prior Art the USPTO would not have allowed the claims of the '120 Patent. The EyeQ Prior Art is also not cumulative because it provided the teachings that were found lacking in the prior art available to the Examiner. The outcome would have been entirely different because the Examiner would have had the evidence that those teachings were known in the art and thus would not have allowed the '120 Patent claims had Garel and/or Wang complied with his/their duty of disclosure.

**g. Materiality As To The '731 Patent**

215. The EyeQ Prior Art anticipated and/or rendered obvious at least claims 1-18 of the '731 Patent. See Exhibit M.

216. The EyeQ Prior Art was not cumulative of the prior art considered by the Examiner during the prosecution because the Examiner had no prior art that anticipated the claims.

217. Had the EyeQ Prior Art been cited to the USPTO, the Examiner would not have allowed the claims of the '731 Patent and instead would have rejected them as anticipated and/or obvious.

218. Even if the EyeQ Prior Art did not anticipate, if the Examiner had the EyeQ Prior Art the Examiner would not have allowed the claims for the reasons identified in the Notice of Allowance. That is because those features were expressly disclosed in the EyeQ Prior Art, which Garel and/or Wang put into the public domain and failed to disclose to the USPTO, as identified above.

219. The EyeQ Prior Art was therefore material to the patentability of the claims of the '731 Patent, and but for the failure to disclose the EyeQ Prior Art the USPTO would not have allowed the claims of the '731 Patent. The EyeQ Prior Art is also not cumulative because it provided the teachings that were found lacking in the prior art available to the Examiner. The outcome would have been entirely different because the Examiner would have had the evidence that those teachings were known in the art and thus would not have allowed the '731 Patent claims had Garel and/or Wang complied with his/their duty of disclosure.

**h. Materiality As To The '121 Patent**

220. The EyeQ Prior Art anticipated and/or rendered obvious at least claims 1-26 of the '121 Patent. See Exhibit N.

221. The EyeQ Prior Art was not cumulative of the prior art considered by the Examiner during the prosecution because the Examiner had no prior art that anticipated the claims.

222. Had the EyeQ Prior Art been cited to the USPTO, the Examiner would not have allowed the claims of the '121 Patent and instead would have rejected them as anticipated and/or obvious.

223. Even if the EyeQ Prior Art did not anticipate, if the Examiner had the EyeQ Prior Art the Examiner would not have allowed the claims for the reasons identified in the Notice of Allowance. That is because those features were expressly disclosed in the EyeQ Prior Art, which Garel and/or Wang put into the public domain and failed to disclose to the USPTO, as identified above.

224. The EyeQ Prior Art was therefore material to the patentability of the claims of the '121 Patent, and but for the failure to disclose the EyeQ Prior Art the USPTO would not have allowed the claims of the '121 Patent. The EyeQ Prior Art is also not cumulative because it provided the teachings that were found lacking in the prior art available to the Examiner. The outcome would have been entirely different because the Examiner would have had the evidence that those

teachings were known in the art and thus would not have allowed the ‘121 Patent claims had Garel and/or Wang complied with his/their duty of disclosure.

### i. Materiality As To The ‘718 Patent

225. The EyeQ Prior Art anticipated various limitations in at least claims 1 and 10 of the ‘718 Patent, and, in combination with other prior art (e.g., Kelliher, Sharma), rendered obvious at least claims 1-18 of the ‘718 Patent.

226. For example, claim 1 of the ‘718 Patent recites “gathering information of one or more products that the first person retained while shopping at the store.” The EyeQ Prior Art taught this recitation. See, e.g., eyeQ Business Plan (Exh. E) at 14; eyeQ Business Plan at 5 (“Monitoring Consumer Purchase Behavior: eyeQ AtShelf will capture consumer behavior using video cameras installed at or nearby a retailer's shelf. This information captured is analyzed using eyeQ's real-time video analytics algorithms. AtShelf will continuously process behavior data for every consumer walking by and interacting with product on the shelf. The information captured includes consumer demographics, the order in which products are selected, time spent with each product, promotions offered, and **what product they walked off with.**”); eyeQ TVL February 2012 Presentation at 7:05-7:40 (system recognizing in real time that the person picked up a Ryobi or DeWalt drill, with the drill being specifically identified (and enclosed within a red box and labeled)); eyeQ TVL February 2012 Presentation at 7:25-44 (eyeQ system recognizing that “she picked up a DeWalt drill”); eyeQ TVL February 2012 Presentation at 21:50-22:20 (eyeQ identifies which product the person picks up). It would have been obvious to have incorporated this limitation into other prior art relied upon in Defendants’ invalidity contentions (e.g., Kelliher, Sharma) in view of the EyeQ Prior Art so that the system can identify the products being retained by the customer so as to better ensure that the customer ultimately pays for the products the customer has retained, consistent with the goals of the prior art (e.g., Kelliher, Sharma).

227. The EyeQ Prior Art was not cumulative of the prior art considered by the Examiner during the prosecution because the Examiner had no prior art disclosing these limitations or showing that it was obvious to combine them with other prior art.

228. Had the EyeQ Prior Art been cited to the USPTO, the Examiner would not have allowed the claims of the '718 Patent and instead would have rejected them as obvious in view of the EyeQ Prior Art.

229. If the Examiner had the EyeQ Prior Art the Examiner would not have allowed the claims for the reasons identified in the Notice of Allowance. That is because various claimed features were expressly disclosed in the EyeQ Prior Art, which Garel and/or Wang put into the public domain and failed to disclose to the USPTO, as identified above.

230. The EyeQ Prior Art was therefore material to the patentability of the claims of the '718 Patent, and but for the failure to disclose the EyeQ Prior Art the USPTO would not have allowed the claims of the '718 Patent. The EyeQ Prior Art is also not cumulative because it provided the teachings that were found lacking in the prior art available to the Examiner. The outcome would have been entirely different because the Examiner would have had the evidence that those teachings were known in the art and thus would not have allowed the '718 Patent claims had Garel and/or Wang complied with his/their duty of disclosure.

**3) Infectious Unenforceability**

231. The misrepresentations and withholding of material prior art that occurred in earlier Asserted Patents also permeated the entire family.

232. As mentioned above, during the prosecution of the '571 Patent it was argued that tracking persons was a distinguishing feature. '571 Patent Prosecution History, 9/22/17 Amendment at 36. The Examiner likewise cited the use of tracking persons in the Notice of

Allowance. '571 Patent Prosecution History, Notice of Allowance at 5. Also as mentioned above, the tracking claimed was already known from the withheld prior art.

233. That tracking concept was carried over to and included in numerous claims in the Asserted Patents. Thus, the withholding of information permeated and infected the family, as customer tracking was repeatedly included in the claims, despite it already having been put into the public domain as prior art by Garel and/or Wang.

234. For example, claim 1 of the '121 Patent recites "the gathered shopping information comprises gathered traffic information of the first person," which is tracking and "(d) using the one or more of the information monitoring devices to track the first person to a point-of-sale area of the retail store." Claim 21 of the '121 Patent similarly recites "the gathered shopping information comprises gathered traffic information of the first person" and "(iv) using the one or more of the information monitoring devices to track the first person to a point-of-sale area of the retail store." The tracking that was argued in the earlier patents and became part of the reason for allowance for those earlier patents was thus also included in the later '121 Patent. The tracking was also included in the reasons for allowance for the '121 Patent specifically as well. '121 Patent Prosecution History, Notice of Allowance at 14-17.

235. Claim 1 of the '120 Patent recites "the step of gathering information using the one or more information monitoring devices comprises (A) gathering traffic information of the persons within and about the retail store, wherein the traffic information comprises (I) tracking movement of the persons relative to the one or more information monitoring devices, (II) identification of one or more stops that the persons make within and about the retail store, and (III) tracking position and duration of stop of the persons for each of the one or more stops[.]" Again, the tracking that was argued in the earlier patents and became part of the reason for

allowance for those earlier patents was thus also included in the later ‘120 Patent. The tracking was also included in the reasons for allowance for the ‘120 Patent specifically as well. ’120 Patent Prosecution History, Notice of Allowance at 2-3.

236. Claim 1 of the ‘731 Patent recites: “(b) tracking the person using one or more second information monitoring devices to determine the location of the person.” Again, the tracking that was argued in the earlier patents and became part of the reason for allowance for those earlier patents was thus also included in the later ‘731 Patent. The requirement of tracking was also reflected in the reasons for allowance of the ‘731 Patent because the “communication” identified was responsive to “determined location of the person,” i.e., tracking. ’731 Patent Prosecution History, Notice of Allowance at 2-3. Claim 1 of the ‘718 Patent recites “(B) tracking the first person to a point-of-sale area of the retail store[.]” Again, the tracking that was argued in the earlier patents and became part of the reason for allowance for those earlier patents was thus also included in the later ‘718 Patent.

237. As a result, the EyeQ Prior Art anticipated and/or rendered obvious the asserted claims in each of the ‘571, ‘825, ‘672, ‘890, ‘880, ‘121, ‘120, ‘731, and ‘718 patents. See Exhibits G-N. The ‘718 Patent is a continuation of the ‘121 Patent, which is a continuation of U.S. Patent No. 12,175,484, which is a continuation of the ‘731 Patent, which is a continuation of U.S. Patent No. 12,039,550, which is a continuation of the ‘880 Patent, which is a continuation of the ‘825 Patent, which is a continuation of the ‘571 Patent.

238. The ‘880, ‘120, ‘890, and ‘672 Patents are each continuations of the ‘825 Patent, which is a continuation of the ‘571 Patent.

239. Each of the ‘825, ‘672, ‘890, ‘880, ‘121, ‘120, ‘731, and ‘718 Patents are patentably indistinct from their upstream related patent(s) (e.g., the ‘571 Patent and the ‘825 Patent). For

example, during prosecution of each of the ‘890, ‘880, ‘731, ‘121, and ‘718 Patents, the USPTO Examiner found that the claims of these patents were directed to subject matter that was patentably indistinct from either or both of the ‘571 and ‘825 Patents. During prosecution of the ‘825 Patent, the USPTO Examiner found that the claims of the ‘825 Patent were directed to subject matter that was patentably indistinct from the ‘571 Patent. Each of the ‘890, ‘880, ‘731, ‘121, and ‘718 Patents required terminal disclaimers over the ‘571 Patent, the ‘825 Patent, or both to secure issuance, thereby demonstrating their lack of patentable distinctiveness from the ‘571 and/or ‘825 Patents. The ‘890, ‘880, ‘731, ‘121, and ‘718 Patents are patentably indistinct from either the ‘571 Patent, the ‘825 Patent, or both.

240. The inequitable conduct was thus pervasive and persistent throughout the family and unenforceability of all Asserted Patents is the appropriate remedy for addressing the inequitable conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Counterclaim Plaintiff Kroger prays that this Court enter judgment in its favor and against Counterclaim Defendant as follows:

1. A judgment dismissing the First Amended Complaint against Kroger with prejudice;
2. A judgment that Kroger has not infringed, contributed to infringement of, or induced others to infringe, either directly or indirectly, any valid claim of any Asserted Patent;
3. A judgment that all claims of the Asserted Patents are invalid;
4. A judgment that all Asserted Patents are unenforceable for inequitable conduct;

5. A judgment that the Court find this case exceptional under 35 U.S.C. § 285 and order an award to Kroger of its fees and expenses of litigation, or under any other applicable rule, statute or the Court's inherent authority; and
6. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Counterclaim Plaintiff hereby demands a trial by jury with respect to all issues and claims, asserted by any party, triable of right by a jury, in the above-captioned action.

Date: October 13, 2026

Respectfully submitted,

/s/ *William P. Atkins*

William P. Atkins
D.C. Bar No. 43129
CUSHMAN PARTNERS LLC
1100 H Street NW, Suite 740
Washington, D.C. 20005
Phone: 202-991-6000
Email: wpa@cushmanlaw.com

Benjamin L. Kiersz
Virginia Bar No. 47032
PILLSBURY WINTHROP SHAW PITTMAN
7900 Tysons Place; Suite 500
McLean, Virginia 22102
Phone: 703-770-7900
Fax: 703-770-7901
Email: benjamin.kiersz@pillsburylaw.com

Gregory Phillip Love
Texas Bar No. 24013060
CHERRY JOHNSON SIEGMUND JAMES
104 E. Houston Street, Suite 115
Marshall, Texas 75670
Phone: 903-212-4444
Fax: 903-392-2267
Email: glove@cjsjlaw.com

**ATTORNEYS FOR DEFENDANT THE KROGER CO.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 13, 2026 a true and correct copy of the Answer and Counterclaims as well as corresponding Exhibits A to P are being served on all counsel of record via email. Counsel at two firms for Defendant The Kroger Co. have been unable to access the Pacer ECF system to upload these documents despite repeated attempts. As such, these are being served by email and the clerk's office will be contacted tomorrow.

*/s/ Rebecca M. Hale*
Rebecca M. Hale

## CERTIFICATE OF SERVICE

I certify that on October 14, 2026, the foregoing Answer and Counterclaims as well as corresponding Exhibits A to P are being filed electronically through the Court's CM/ECF system, which transmits notice of the filing to all counsel of record registered to receive electronic notice. The same Answer and Counterclaims as well as corresponding Exhibits A to P were served by email on all counsel of record yesterday, October 13, 2026, as reflected in the certificate of service on the preceding page.

*/s/ Cynthia Stroesser*
Cynthia Stroesser